511 U.S. 127 (1994)
J. E. B.
v.
ALABAMA ex rel. T. B.
No. 92-1239.
United States Supreme Court.
Argued November 2, 1993.
Decided April 19, 1994.
CERTIORARI TO THE COURT OF CIVIL APPEALS OF ALABAMA
Blackmun, J., delivered the opinion of the Court, in which Stevens, O'Connor, Souter, and Ginsburg, JJ., joined. O'Connor, J., filed a concurring opinion, post, p. 146. Kennedy, J., filed an opinion concurring in the judgment, post, p. 151. Rehnquist, C. J., filed a dissenting opinion, post, p. 154. Scalia, J., filed a dissenting opinion, in which Rehnquist, C. J., and Thomas, J., joined, post, p. 156.
*128 John F. Porter III argued the cause and filed briefs for petitioner.
Michael R. Dreeben argued the cause for the United States as amicus curiae urging reversal. With him on the brief were Solicitor General Days, Acting Assistant Attorneys General Keeney and Turner, and Deputy Solicitor General Bryson. 
Lois N. Brasfield, Assistant Attorney General of Alabama, argued the cause for respondent. With her on the briefs was William F. Prendergast, Assistant Attorney General.[*]
Justice Blackmun, delivered the opinion of the Court.
In Batson v. Kentucky, 476 U. S. 79 (1986), this Court held that the Equal Protection Clause of the Fourteenth Amendment governs the exercise of peremptory challenges by a prosecutor in a criminal trial. The Court explained that although a defendant has "no right to a `petit jury composed in whole or in part of persons of his own race,' " id. , at 85, quoting Strauder v. West Virginia, 100 U. S. 303, 305 (1880), the "defendant does have the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria," 476 U. S., at 85-86. Since Batson, we have reaffirmed repeatedly our commitment to jury selection procedures that are fair and nondiscriminatory. We have recognized that whether the trial is criminal or civil, potential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice. See Powers v. Ohio, 499 U. S. 400 (1991); Edmonson v. Leesville Concrete Co., 500 U. S. 614 (1991); Georgia v. McCollum, 505 U. S. 42 (1992).
Although premised on equal protection principles that apply equally to gender discrimination, all our recent cases *129 defining the scope of Batson involved alleged racial discrimination in the exercise of peremptory challenges. Today we are faced with the question whether the Equal Protection Clause forbids intentional discrimination on the basis of gender, just as it prohibits discrimination on the basis of race. We hold that gender, like race, is an unconstitutional proxy for juror competence and impartiality.

I
On behalf of relator T. B., the mother of a minor child, respondent State of Alabama filed a complaint for paternity and child support against petitioner J. E. B. in the District Court of Jackson County, Alabama. On October 21, 1991, the matter was called for trial and jury selection began. The trial court assembled a panel of 36 potential jurors, 12 males and 24 females. After the court excused three jurors for cause, only 10 of the remaining 33 jurors were male. The State then used 9 of its 10 peremptory strikes to remove male jurors; petitioner used all but one of his strikes to remove female jurors. As a result, all the selected jurors were female.
Before the jury was empaneled, petitioner objected to the State's peremptory challenges on the ground that they were exercised against male jurors solely on the basis of gender, in violation of the Equal Protection Clause of the Fourteenth Amendment. App. 22. Petitioner argued that the logic and reasoning of Batson v. Kentucky, which prohibits peremptory strikes solely on the basis of race, similarly forbids intentional discrimination on the basis of gender. The court rejected petitioner's claim and empaneled the all-female jury. App. 23. The jury found petitioner to be the father of the child, and the court entered an order directing him to pay child support. On postjudgment motion, the court reaffirmed its ruling that Batson does not extend to genderbased peremptory challenges. App. 33. The Alabama Court of Civil Appeals affirmed, 606 So. 2d 156 (1992), relying *130 on Alabama precedent, see, e. g., Murphy v.State, 596 So. 2d 42 (Ala. Crim. App. 1991), cert. denied, 506 U. S. 827 (1992), and Ex parte Murphy, 596 So. 2d 45 (Ala. 1992). The Supreme Court of Alabama denied certiorari, No. 1911717 (Oct. 23, 1992).
We granted certiorari, 508 U. S. 905 (1993), to resolve a question that has created a conflict of authoritywhether the Equal Protection Clause forbids peremptory challenges on the basis of gender as well as on the basis of race.[1] Today we reaffirm what, by now, should be axiomatic: Intentional discrimination on the basis of gender by state actors violates *131 the Equal Protection Clause, particularly where, as here, the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women.

II
Discrimination on the basis of gender in the exercise of peremptory challenges is a relatively recent phenomenon. Gender-based peremptory strikes were hardly practicable during most of our country's existence, since, until the 20th century, women were completely excluded from jury service.[2] So well entrenched was this exclusion of women that in 1880 this Court, while finding that the exclusion of African-American men from juries violated the Fourteenth Amendment, expressed no doubt that a State "may confine the selection [of jurors] to males." Strauder v. West Virginia, 100 U. S., at 310; see also Fay v. New York, 332 U. S. 261, 289-290 (1947).
Many States continued to exclude women from jury service well into the present century, despite the fact that women attained suffrage upon ratification of the Nineteenth Amendment in 1920.[3] States that did permit women to serve on juries often erected other barriers, such as registration requirements and automatic exemptions, designed to deter women from exercising their right to jury service. See, e. g., *132 Fay v. New York, 332 U. S., at 289 ("[I]n 15 of the 28 states which permitted women to serve [on juries in 1942], they might claim exemption because of their sex"); Hoyt v. Florida, 368 U. S. 57 (1961) (upholding affirmative registration statute that exempted women from mandatory jury service).
The prohibition of women on juries was derived from the English common law which, according to Blackstone, rightfully excluded women from juries under "the doctrine of propter defectum sexus, literally, the `defect of sex.' " United States v. De Gross, 960 F. 2d 1433, 1438 (CA9 1992) (en banc), quoting 2 W. Blackstone, Commentaries *362.[4] In this country, supporters of the exclusion of women from juries tended to couch their objections in terms of the ostensible need to protect women from the ugliness and depravity of trials. Women were thought to be too fragile and virginal to withstand the polluted courtroom atmosphere. See Bailey v. State, 215 Ark. 53, 61, 219 S. W. 2d 424, 428 (1949) ("Criminal court trials often involve testimony of the foulest kind, and they sometimes require consideration of indecent conduct, the use of filthy and loathsome words, references to intimate sex relationships, and other elements that would prove humiliating, embarrassing and degrading to a lady"); In re Goodell, 39 Wis. 232, 245-246 (1875) (endorsing statutory ineligibility of women for admission to the bar because "[r]everence for all womanhood would suffer in the public *133 spectacle of women . . . so engaged"); Bradwell v. State, 16 Wall. 130, 141 (1873) (concurring opinion) ("[T]he civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman. Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. . . . The paramount destiny and mission of woman are to fulfil the noble and benign offices of wife and mother. This is the law of the Creator"). Cf. Frontiero v. Richardson, 411 U. S. 677, 684 (1973) (plurality opinion) (This "attitude of `romantic paternalism' . . . put women, not on a pedestal, but in a cage").
This Court in Ballard v. United States, 329 U. S. 187 (1946), first questioned the fundamental fairness of denying women the right to serve on juries. Relying on its supervisory powers over the federal courts, it held that women may not be excluded from the venire in federal trials in States where women were eligible for jury service under local law. In response to the argument that women have no superior or unique perspective, such that defendants are denied a fair trial by virtue of their exclusion from jury panels, the Court explained:
"It is said . . . that an all male panel drawn from the various groups within a community will be as truly representative as if women were included. The thought is that the factors which tend to influence the action of women are the same as those which influence the action of menpersonality, background, economic statusand not sex. Yet it is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men likewise do not act like a class. . . . The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on *134 the other is among the imponderables. To insulate the courtroom from either may not in a given case make an iota of difference. Yet a flavor, a distinct quality is lost if either sex is excluded." Id. , at 193-194 (footnotes omitted).
Fifteen years later, however, the Court still was unwilling to translate its appreciation for the value of women's contribution to civic life into an enforceable right to equal treatment under state laws governing jury service. In Hoyt v. Florida, 368 U. S., at 61, the Court found it reasonable, "[d]espite the enlightened emancipation of women," to exempt women from mandatory jury service by statute, allowing women to serve on juries only if they volunteered to serve. The Court justified the differential exemption policy on the ground that women, unlike men, occupied a unique position "as the center of home and family life." Id. , at 62.
In 1975, the Court finally repudiated the reasoning of Hoyt and struck down, under the Sixth Amendment, an affirmative registration statute nearly identical to the one at issue in Hoyt . See Taylor v. Louisiana, 419 U. S. 522 (1975).[5] We explained: "Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." Id. , at 530. The diverse and representative character of the jury must be maintained "`partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility.' " Id. , at 530-531, quoting Thiel v. Southern Pacific Co., 328 U. S. 217, 227 (1946) (Frankfurter, *135 J., dissenting). See also Duren v. Missouri, 439 U. S. 357 (1979).

III
Taylor relied on Sixth Amendment principles, but the opinion's approach is consistent with the heightened equal protection scrutiny afforded gender-based classifications. Since Reed v. Reed, 404 U. S. 71 (1971), this Court consistently has subjected gender-based classifications to heightened scrutiny in recognition of the real danger that government policies that professedly are based on reasonable considerations in fact may be reflective of "archaic and overbroad" generalizations about gender, see Schlesinger v. Ballard, 419 U. S. 498, 506-507 (1975), or based on "outdated misconceptions concerning the role of females in the home rather than in the `marketplace and world of ideas.' " Craig v. Boren, 429 U. S. 190, 198-199 (1976). See also Cleburne v. Cleburne Living Center, Inc., 473 U. S. 432, 441 (1985) (differential treatment of the sexes "very likely reflect[s] outmoded notions of the relative capabilities of men and women").
Despite the heightened scrutiny afforded distinctions based on gender, respondent argues that gender discrimination in the selection of the petit jury should be permitted, though discrimination on the basis of race is not. Respondent suggests that "gender discrimination in this country . . . has never reached the level of discrimination" against African-Americans, and therefore gender discrimination, unlike racial discrimination, is tolerable in the courtroom. Brief for Respondent 9.
While the prejudicial attitudes toward women in this country have not been identical to those held toward racial minorities, the similarities between the experiences of racial minorities and women, in some contexts, "overpower those differences." Note, Beyond Batson: Eliminating GenderBased Peremptory Challenges, 105 Harv. L. Rev. 1920, 1921 *136 (1992). As a plurality of this Court observed in Frontiero v. Richardson, 411 U. S., at 685:
"[T]hroughout much of the 19th century the position of women in our society was, in many respects, comparable to that of blacks under the pre-Civil War slave codes. Neither slaves nor women could hold office, serve on juries, or bring suit in their own names, and married women traditionally were denied the legal capacity to hold or convey property or to serve as legal guardians of their own children. . . . And although blacks were guaranteed the right to vote in 1870, women were denied even that rightwhich is itself `preservative of other basic civil and political rights'until adoption of the Nineteenth Amendment half a century later." (Footnote omitted.)
Certainly, with respect to jury service, African-Americans and women share a history of total exclusion, a history which came to an end for women many years after the embarrassing chapter in our history came to an end for African-Americans.
We need not determine, however, whether women or racial minorities have suffered more at the hands of discriminatory state actors during the decades of our Nation's history. It is necessary only to acknowledge that "our Nation has had a long and unfortunate history of sex discrimination," id., at 684, a history which warrants the heightened scrutiny we afford all gender-based classifications today. Under our equal protection jurisprudence, gender-based classifications require "an exceedingly persuasive justification" in order to survive constitutional scrutiny. See Personnel Administrator of Mass. v. Feeney, 442 U. S. 256, 273 (1979). See also Mississippi Univ. for Women v. Hogan, 458 U. S. 718, 724 (1982); Kirchberg v. Feenstra, 450 U. S. 455, 461 (1981). Thus, the only question is whether discrimination on the basis of gender in jury selection substantially furthers the State's legitimate interest in achieving a fair and impartial *137 trial.[6] In making this assessment, we do not weigh the value of peremptory challenges as an institution against our asserted commitment to eradicate invidious discrimination from the courtroom.[7] Instead, we consider whether peremptory challenges based on gender stereotypes provide substantial aid to a litigant's effort to secure a fair and impartial jury.[8]
Far from proffering an exceptionally persuasive justification for its gender-based peremptory challenges, respondent maintains that its decision to strike virtually all the males from the jury in this case "may reasonably have been based upon the perception, supported by history, that men otherwise totally qualified to serve upon a jury in any case might *138 be more sympathetic and receptive to the arguments of a man alleged in a paternity action to be the father of an outof-wedlock child, while women equally qualified to serve upon a jury might be more sympathetic and receptive to the arguments of the complaining witness who bore the child." Brief for Respondent 10.[9]
We shall not accept as a defense to gender-based peremptory challenges "the very stereotype the law condemns." Powers v. Ohio, 499 U. S., at 410. Respondent's rationale, not unlike those regularly expressed for gender-based strikes, is reminiscent of the arguments advanced to justify the total exclusion of women from juries.[10] Respondent offers *139 virtually no support for the conclusion that gender alone is an accurate predictor of juror's attitudes; yet it urges this Court to condone the same stereotypes that justified the wholesale exclusion of women from juries and the ballot box.[11] Respondent seems to assume that gross generalizations that would be deemed impermissible if made on the *140 basis of race are somehow permissible when made on the basis of gender.
Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceedings. See Edmonson, 500 U. S., at 628 (discrimination in the courtroom "raises serious questions as to the fairness of the proceedings conducted there"). The community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.
When state actors exercise peremptory challenges in reliance on gender stereotypes, they ratify and reinforce prejudicial views of the relative abilities of men and women. Because these stereotypes have wreaked injustice in so many other spheres of our country's public life, active discrimination by litigants on the basis of gender during jury selection "invites cynicism respecting the jury's neutrality and its obligation to adhere to the law." Powers v. Ohio, 499 U. S., at 412. The potential for cynicism is particularly acute in cases where gender-related issues are prominent, such as cases involving rape, sexual harassment, or paternity. Discriminatory use of peremptory challenges may create the impression that the judicial system has acquiesced in suppressing full participation by one gender or that the "deck has been stacked" in favor of one side. See id., at 413 ("The verdict will not be accepted or understood [as fair] if the jury is chosen by unlawful means at the outset").
In recent cases we have emphasized that individual jurors themselves have a right to nondiscriminatory jury selection *141 procedures.[12] See Powers, supra, Edmonson, supra, and Georgia v. McCollum, 505 U. S. 42 (1992). Contrary to respondent's suggestion, this right extends to both men and women. See Mississippi Univ. for Women v. Hogan, 458 U. S, at 723 (that a state practice "discriminates against males rather than against females does not exempt it from scrutiny or reduce the standard of review"); cf. Brief for Respondent 9 (arguing that men deserve no protection from gender discrimination in jury selection because they are not victims of historical discrimination). All persons, when granted the opportunity to serve on a jury, have the right not to be excluded summarily because of discriminatory and stereotypical presumptions that reflect and reinforce patterns *142 of historical discrimination.[13] Striking individual jurors on the assumption that they hold particular views simply because of their gender is "practically a brand upon them, affixed by the law, an assertion of their inferiority." Strauder v. West Virginia, 100 U. S., at 308. It denigrates the dignity of the excluded juror, and, for a woman, reinvokes a history of exclusion from political participation.[14] The message itsends to all those in the courtroom, and all those who may later learn of the discriminatory act, is that certain individuals, for no reason other than gender, are presumed unqualified by state actors to decide important questions upon which reasonable persons could disagree.[15]

*143 IV
Our conclusion that litigants may not strike potential jurors solely on the basis of gender does not imply the elimination of all peremptory challenges. Neither does it conflict with a State's legitimate interest in using such challenges in its effort to secure a fair and impartial jury. Parties still may remove jurors who they feel might be less acceptable than others on the panel; gender simply may not serve as a proxy for bias. Parties may also exercise their peremptory challenges to remove from the venire any group or class of individuals normally subject to "rational basis" review. See Cleburne v. Cleburne Living Center, Inc., 473 U. S., at 439 442; Clark v. Jeter, 486 U. S. 456, 461 (1988). Even strikes based on characteristics that are disproportionately associated with one gender could be appropriate, absent a showing of pretext.[16]
If conducted properly, voir dire can inform litigants about potential jurors, making reliance upon stereotypical and pejorative notions about a particular gender or race both unnecessary and unwise. Voir dire provides a means of discovering actual or implied bias and a firmer basis upon which the *144 parties may exercise their peremptory challenges intelligently. See, e. g., Nebraska Press Assn. v. Stuart, 427 U. S. 539, 602 (1976) (Brennan, J., concurring in judgment) (voir dire "facilitate[s] intelligent exercise of peremptory challenges and [helps] uncover factors that would dictate disqualification for cause"); United States v. Witt, 718 F. 2d 1494, 1497 (CA10 1983) ("Without an adequate foundation [laid by voir dire ], counsel cannot exercise sensitive and intelligent peremptory challenges").
The experience in the many jurisdictions that have barred gender-based challenges belies the claim that litigants and trial courts are incapable of complying with a rule barring strikes based on gender. See n. 1, supra (citing state and federal jurisdictions that have extended Batson to gender).[17] As with race-based Batson claims, a party alleging gender discrimination must make a prima facie showing of intentional *145 discrimination before the party exercising the challenge is required to explain the basis for the strike. Batson, 476 U. S., at 97. When an explanation is required, it need not rise to the level of a "for cause" challenge; rather, it merely must be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual. See Hernandez v. New York, 500 U. S. 352 (1991).
Failing to provide jurors the same protection against gender discrimination as race discrimination could frustrate the purpose of Batson itself. Because gender and race are overlapping categories, gender can be used as a pretext for racial discrimination.[18] Allowing parties to remove racial minorities from the jury not because of their race, but because of their gender, contravenes well-established equal protection principles and could insulate effectively racial discrimination from judicial scrutiny.

V
Equal opportunity to participate in the fair administration of justice is fundamental to our democratic system.[19] It not *146 only furthers the goals of the jury system. It reaffirms the promise of equality under the lawthat all citizens, regardless of race, ethnicity, or gender, have the chance to take part directly in our democracy. Powers v. Ohio, 499 U. S., at 407 ("Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process"). When persons are excluded from participation in our democratic processes solely because of race or gender, this promise of equality dims, and the integrity of our judicial system is jeopardized.
In view of these concerns, the Equal Protection Clause prohibits discrimination in jury selection on the basis of gender, or on the assumption that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man. As with race, the "core guarantee of equal protection, ensuring citizens that their State will not discriminate . . . , would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' [gender]." Batson, 476 U. S., at 97-98.
The judgment of the Court of Civil Appeals of Alabama is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.
It is so ordered. 
Justice O'Connor, concurring.
I agree with the Court that the Equal Protection Clause prohibits the government from excluding a person from jury service on account of that person's gender. Ante, at 135 137. The State's proffered justifications for its genderbased peremptory challenges are far from the "`exceedingly persuasive' " showing required to sustain a gender-based *147 classification. Mississippi Univ. for Women v. Hogan, 458 U. S. 718, 724 (1982); ante, at 137-140. I therefore join the Court's opinion in this case. But today's important blow against gender discrimination is not costless. I write separately to discuss some of these costs, and to express my belief that today's holding should be limited to the government's use of gender-based peremptory strikes.
Batson v. Kentucky, 476 U. S. 79 (1986), itself was a significant intrusion into the jury selection process. Batson minihearings are now routine in state and federal trial courts, and Batson appeals have proliferated as well. Demographics indicate that today's holding may have an even greater impact than did Batson itself. In further constitutionalizing jury selection procedures, the Court increases the number of cases in which jury selectiononce a sideshow will become part of the main event.
For this same reason, today's decision further erodes the role of the peremptory challenge. The peremptory challenge is "a practice of ancient origin" and is "part of our common law heritage." Edmonson v. Leesville Concrete Co., 500 U. S. 614, 639 (1991) (O'Connor, J., dissenting). The principal value of the peremptory is that it helps produce fair and impartial juries. Swain v. Alabama, 380 U. S. 202, 218-219 (1965); Babcock, Voir Dire: Preserving "Its Wonderful Power," 27 Stan. L. Rev. 545, 549-558 (1975). "Peremptory challenges, by enabling each side to exclude those jurors it believes will be most partial toward the other side, are a means of eliminat[ing] extremes of partiality on both sides, thereby assuring the selection of a qualified and unbiased jury." Holland v. Illinois, 493 U. S. 474, 484 (1990) (emphasis deleted; internal quotation marks and citations omitted). The peremptory's importance is confirmed by its persistence: It was well established at the time of Blackstone and continues to endure in all the States. Id., at 481.
Moreover, "[t]he essential nature of the peremptory challenge is that it is one exercised without a reason stated, without *148 inquiry and without being subject to the court's control." Swain, 380 U. S., at 220. Indeed, often a reason for it cannot be stated, for a trial lawyer's judgments about a juror's sympathies are sometimes based on experienced hunches and educated guesses, derived from a juror's responses at voir dire or a juror's "`bare looks and gestures.' " Ibid. That a trial lawyer's instinctive assessment of a juror's predisposition cannot meet the high standards of a challenge for cause does not mean that the lawyer's instinct is erroneous. Cf. V. Starr & M. McCormick, Jury Selection 522 (1993) (nonverbal cues can be better than verbal responses at revealing a juror's disposition). Our belief that experienced lawyers will often correctly intuit which jurors are likely to be the least sympathetic, and our understanding that the lawyer will often be unable to explain the intuition, are the very reason we cherish the peremptory challenge. But, as we add, layer by layer, additional constitutional restraints on the use of the peremptory, we force lawyers to articulate what we know is often inarticulable.
In so doing we make the peremptory challenge less discretionary and more like a challenge for cause. We also increase the possibility that biased jurors will be allowed onto the jury, because sometimes a lawyer will be unable to provide an acceptable gender-neutral explanation even though the lawyer is in fact correct that the juror is unsympathetic. Similarly, in jurisdictions where lawyers exercise their strikes in open court, lawyers may be deterred from using their peremptories, out of the fear that if they are unable to justify the strike the court will seat a juror who knows that the striking party thought him unfit. Because I believe the peremptory remains an important litigator's tool and a fundamental part of the process of selecting impartial juries, our increasing limitation of it gives me pause.
Nor is the value of the peremptory challenge to the litigant diminished when the peremptory is exercised in a genderbased manner. We know that like race, gender matters. A *149 plethora of studies make clear that in rape cases, for example, female jurors are somewhat more likely to vote to convict than male jurors. See R. Hastie, S. Penrod, & N. Pennington, Inside the Jury 140-141 (1983) (collecting and summarizing empirical studies). Moreover, though there have been no similarly definitive studies regarding, for example, sexual harassment, child custody, or spousal or child abuse, one need not be a sexist to share the intuition that in certain cases a person's gender and resulting life experience will be relevant to his or her view of the case. "`Jurors are not expected to come into the jury box and leave behind all that their human experience has taught them.' " Beck v. Alabama, 447 U. S. 625, 642 (1980). Individuals are not expected to ignore as jurors what they know as men or women.
Today's decision severely limits a litigant's ability to act on this intuition, for the import of our holding is that any correlation between a juror's gender and attitudes is irrelevant as a matter of constitutional law. But to say that gender makes no difference as a matter of law is not to say that gender makes no difference as a matter of fact. I previously have said with regard to Batson: "That the Court will not tolerate prosecutors' racially discriminatory use of the peremptory challenge, in effect, is a special rule of relevance, a statement about what this Nation stands for, rather than a statement of fact." Brown v. North Carolina, 479 U. S. 940, 941-942 (1986) (opinion concurring in denial of certiorari). Today's decision is a statement that, in an effort to eliminate the potential discriminatory use of the peremptory, see Batson, 476 U. S., at 102 (Marshall, J., concurring), gender is now governed by the special rule of relevance formerly reserved for race. Though we gain much from this statement, we cannot ignore what we lose. In extending Batson to gender we have added an additional burden to the state and federal trial process, taken a step closer to eliminating the peremptory challenge, and diminished the ability of litigants *150 to act on sometimes accurate gender-based assumptions about juror attitudes.
These concerns reinforce my conviction that today's decision should be limited to a prohibition on the government's use of gender-based peremptory challenges. The Equal Protection Clause prohibits only discrimination by state actors. In Edmonson, supra, we made the mistake of concluding that private civil litigants were state actors when they exercised peremptory challenges; in Georgia v. McCollum, 505 U. S. 42, 50-55 (1992), we compounded the mistake by holding that criminal defendants were also state actors. Our commitment to eliminating discrimination from the legal process should not allow us to forget that not all that occurs in the courtroom is state action. Private civil litigants are just thatprivate litigants. "The government erects the platform; it does not thereby become responsible for all that occurs upon it." Edmonson, 500 U. S., at 632 (O'Connor, J., dissenting).
Clearly, criminal defendants are not state actors. "From arrest, to trial, to possible sentencing and punishment, the antagonistic relationship between government and the accused is clear for all to see. . . . [T]he unique relationship between criminal defendants and the State precludes attributing defendants' actions to the State . . . ." McCollum, supra, at 67 (O'Connor, J., dissenting). The peremptory challenge is "`one of the most important of the rights secured to the accused. ` " Swain, 380 U. S., at 219 (emphasis added); Goldwasser, Limiting a Criminal Defendant's Use of Peremptory Challenges: On Symmetry and the Jury in a Criminal Trial, 102 Harv. L. Rev. 808, 826-833 (1989). Limiting the accused's use of the peremptory is "a serious misordering of our priorities," for it means "we have exalted the right of citizens to sit on juries over the rights of the criminal defendant, even though it is the defendant, not the jurors, who faces imprisonment or even death." McCollum, supra, at 61-62 (Thomas, J., concurring in judgment).
*151 Accordingly, I adhere to my position that the Equal Protection Clause does not limit the exercise of peremptory challenges by private civil litigants and criminal defendants. This case itself presents no state action dilemma, for here the State of Alabama itself filed the paternity suit on behalf of petitioner. But what of the next case? Will we, in the name of fighting gender discrimination, hold that the battered wifeon trial for wounding her abusive husbandis a state actor? Will we preclude her from using her peremptory challenges to ensure that the jury of her peers contains as many women members as possible? I assume we will, but I hope we will not.
Justice Kennedy, concurring in the judgment.
I am in full agreement with the Court that the Equal Protection Clause prohibits gender discrimination in the exercise of peremptory challenges. I write to explain my understanding of why our precedents lead to that conclusion.
Though in some initial drafts the Fourteenth Amendment was written to prohibit discrimination against "persons because of race, color or previous condition of servitude," the Amendment submitted for consideration and later ratified contained more comprehensive terms: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." See Oregon v. Mitchell, 400 U. S. 112, 172-173 (1970) (Harlan, J., concurring in part and dissenting in part); B. Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction, 39th Congress, 1865-1867, pp. 90-91, 97-100 (1914). In recognition of the evident historical fact that the Equal Protection Clause was adopted to prohibit government discrimination on the basis of race, the Court most often interpreted it in the decades that followed in accord with that purpose. In Strauder v. West Virginia, 100 U. S. 303 (1880), for example, the Court invalidated a West Virginia law prohibiting blacks from serving on juries. In so doing, the decision said of the Equal Protection Clause: *152 "What is this but declaring that the law in the States shall be the same for the black as for the white." Id., at 307. And while the Court held that the State could not confine jury service to whites, it further noted that the State could confine jury service "to males, to freeholders, to citizens, to persons within certain ages, or to persons having educational qualifications." Id., at 310. See also Yick Wo v. Hopkins, 118 U. S. 356, 373-374 (1886).
As illustrated by the necessity for the Nineteenth Amendment in 1920, much time passed before the Equal Protection Clause was thought to reach beyond the purpose of prohibiting racial discrimination and to apply as well to discrimination based on sex. In over 20 cases beginning in 1971, however, we have subjected government classifications based on sex to heightened scrutiny. Neither the State nor any Member of the Court questions that principle here. And though the intermediate scrutiny test we have applied may not provide a very clear standard in all instances, see Craig v. Boren, 429 U. S. 190, 221 (1976) (Rehnquist, J., dissenting), our case law does reveal a strong presumption that gender classifications are invalid. See, e. g., Mississippi Univ. for Women v. Hogan, 458 U. S. 718 (1982).
There is no doubt under our precedents, therefore, that the Equal Protection Clause prohibits sex discrimination in the selection of jurors. Duren v. Missouri, 439 U. S. 357 (1979); Taylor v. Louisiana, 419 U. S. 522 (1975). The only question is whether the Clause also prohibits peremptory challenges based on sex. The Court is correct to hold that it does. The Equal Protection Clause and our constitutional tradition are based on the theory that an individual possesses rights that are protected against lawless action by the government. The neutral phrasing of the Equal Protection Clause, extending its guarantee to "any person," reveals its concern with rights of individuals, not groups (though group disabilities are sometimes the mechanism by which the State violates the individual right in question). "At the heart of *153 the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial [or] sexual . . . class." Metro Broadcasting, Inc. v. FCC, 497 U. S. 547, 602 (1990) (O'Connor, J., dissenting) (emphasis deleted; internal quotation marks omitted). For purposes of the Equal Protection Clause, an individual denied jury service because of a peremptory challenge exercised against her on account of her sex is no less injured than the individual denied jury service because of a law banning members of her sex from serving as jurors. Cf., e. g., Powers v. Ohio, 499 U. S. 400, 409-410 (1991); Palmore v. Sidoti, 466 U. S. 429, 431-432 (1984); Ex parte Virginia, 100 U. S. 339, 346-347 (1880). The injury is to personal dignity and to the individual's right to participate in the political process. Powers, supra, at 410. The neutrality of the Fourteenth Amendment's guarantee is confirmed by the fact that the Court has no difficulty in finding a constitutional wrong in this case, which involves males excluded from jury service because of their gender.
The importance of individual rights to our analysis prompts a further observation concerning what I conceive to be the intended effect of today's decision. We do not prohibit racial and gender bias in jury selection only to encourage it in jury deliberations. Once seated, a juror should not give free rein to some racial or gender bias of his or her own. The jury system is a kind of compact by which power is transferred from the judge to jury, the jury in turn deciding the case in accord with the instructions defining the relevant issues for consideration. The wise limitation on the authority of courts to inquire into the reasons underlying a jury's verdict does not mean that a jury ought to disregard the court's instructions. A juror who allows racial or gender bias to influence assessment of the case breaches the compact and renounces his or her oath.
In this regard, it is important to recognize that a juror sits not as a representative of a racial or sexual group but as an *154 individual citizen. Nothing would be more pernicious to the jury system than for society to presume that persons of different backgrounds go to the jury room to voice prejudice. Cf. Metro Broadcasting, supra, at 618 (O'Connor, J., dissenting). The jury pool must be representative of the community, but that is a structural mechanism for preventing bias, not enfranchising it. See, e. g., Ballard v. United States, 329 U. S. 187, 193 (1946); Thiel v. Southern Pacific Co., 328 U. S. 217 (1946). "Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system." Id., at 220. Thus, the Constitution guarantees a right only to an impartial jury, not to a jury composed of members of a particular race or gender. See Holland v. Illinois, 493 U. S. 474 (1990); Strauder, 100 U. S., at 305.

* * *
For these reasons, I concur in the judgment of the Court holding that peremptory strikes based on gender violate the Equal Protection Clause.
Chief Justice Rehnquist, dissenting.
I agree with the dissent of Justice Scalia, which I have joined. I add these words in support of its conclusion. Accepting Batson v. Kentucky, 476 U. S. 79 (1986), as correctly decided, there are sufficient differences between race and gender discrimination such that the principle of Batson should not be extended to peremptory challenges to potential jurors based on sex.
That race and sex discrimination are different is acknowledged by our equal protection jurisprudence, which accords different levels of protection to the two groups. Classifications based on race are inherently suspect, triggering "strict scrutiny," while gender-based classifications are judged under a heightened, but less searching, standard of review. Mississippi Univ. for Women v. Hogan, 458 U. S. 718, 724 (1982). Racial groups comprise numerical minorities in our *155 society, warranting in some situations a greater need for protection, whereas the population is divided almost equally between men and women. Furthermore, while substantial discrimination against both groups still lingers in our society, racial equality has proved a more challenging goal to achieve on many fronts than gender equality. See, e. g., D. Kirp, M. Yudof, & M. Franks, Gender Justice 137 (1986).
Batson, which involved a black defendant challenging the removal of black jurors, announced a sea change in the jury selection process. In balancing the dictates of equal protection and the historical practice of peremptory challenges, long recognized as securing fairness in trials, the Court concluded that the command of the Equal Protection Clause was superior. But the Court was careful that its rule not "undermine the contribution the challenge generally makes to the administration of justice." 476 U. S., at 98-99. Batson is best understood as a recognition that race lies at the core of the commands of the Fourteenth Amendment. Not surprisingly, all of our post-Batson cases have dealt with the use of peremptory strikes to remove black or racially identified venirepersons, and all have described Batson as fashioning a rule aimed at preventing purposeful discrimination against a cognizable racial group.[*] As Justice O'Connor once recognized, Batson does not apply "[o]utside the uniquely sensitive area of race." Brown v. North Carolina, 479 U. S. 940, 942 (1986) (opinion concurring in denial of certiorari).
Under the Equal Protection Clause, these differences mean that the balance should tilt in favor of peremptory challenges when sex, not race, is the issue. Unlike the *156 Court, I think the State has shown that jury strikes on the basis of gender "substantially further" the State's legitimate interest in achieving a fair and impartial trial through the venerable practice of peremptory challenges. Swain v. Alabama, 380 U. S. 202, 212-220 (1965) (tracing the "very old credentials" of peremptory challenges); Batson, supra, at 118-120 (Burger, C. J., dissenting); post, at 161-162 (Scalia, J., dissenting). The two sexes differ, both biologically and, to a diminishing extent, in experience. It is not merely "stereotyping" to say that these differences may produce a difference in outlook which is brought to the jury room. Accordingly, use of peremptory challenges on the basis of sex is generally not the sort of derogatory and invidious act which peremptory challenges directed at black jurors may be.
Justice O'Connor's concurring opinion recognizes several of the costs associated with extending Batson to genderbased peremptory challengeslengthier trials, an increase in the number and complexity of appeals addressing jury selection, and a "diminished . . . ability of litigants to act on sometimes accurate gender-based assumptions about juror attitudes." Ante, at 149-150. These costs are, in my view, needlessly imposed by the Court's opinion, because the Constitution simply does not require the result that it reaches.
Justice Scalia, with whom The Chief Justice and Justice Thomas join, dissenting.
Today's opinion is an inspiring demonstration of how thoroughly up-to-date and right-thinking we Justices are in matters pertaining to the sexes (or as the Court would have it, the genders), and how sternly we disapprove the male chauvinist attitudes of our predecessors. The price to be paid for this displaya modest price, surelyis that most of the opinion is quite irrelevant to the case at hand. The hasty reader will be surprised to learn, for example, that this lawsuit involves a complaint about the use of peremptory challenges to exclude men from a petit jury. To be sure, *157 petitioner, a man, used all but one of his peremptory strikes to remove women from the jury (he used his last challenge to strike the sole remaining male from the pool), but the validity of his strikes is not before us. Nonetheless, the Court treats itself to an extended discussion of the historic exclusion of women not only from jury service, but also from service at the bar (which is rather like jury service, in that it involves going to the courthouse a lot). See ante, at 131 136. All this, as I say, is irrelevant, since the case involves state action that allegedly discriminates against men. The parties do not contest that discrimination on the basis of sex[1] is subject to what our cases call "heightened scrutiny," and the citation of one of those cases (preferably one involving men rather than women, see, e. g., Mississippi Univ. for Women v. Hogan, 458 U. S. 718, 723-724 (1982)) is all that was needed.
The Court also spends time establishing that the use of sex as a proxy for particular views or sympathies is unwise and perhaps irrational. The opinion stresses the lack of statistical evidence to support the widely held belief that, at least in certain types of cases, a juror's sex has some statistically significant predictive value as to how the juror will behave. See ante, at 137-139, and n. 9. This assertion seems to place the Court in opposition to its earlier Sixth Amendment "fair cross-section" cases. See, e. g., Taylor v. Louisiana, 419 U. S. 522, 532, n. 12 (1975) ("Controlled studies . . . have concluded that women bring to juries their own perspectives and values that influence both jury deliberation *158 and result"). But times and trends do change, and unisex is unquestionably in fashion. Personally, I am less inclined to demand statistics, and more inclined to credit the perceptions of experienced litigators who have had money on the line. But it does not matter. The Court's fervent defense of the proposition iln'ya pasde différence entre les hommes et les femmes (it stereotypes the opposite view as hateful "stereotyping") turns out to be, like its recounting of the history of sex discrimination against women, utterly irrelevant. Even if sex was a remarkably good predictor in certain cases, the Court would find its use in peremptories unconstitutional. See ante, at 139, n. 11; cf. ante , at 148-149 (O'Connor, J., concurring).
Of course the relationship of sex to partiality would have been relevant if the Court had demanded in this case what it ordinarily demands: that the complaining party have suffered some injury. Leaving aside for the moment the reality that the defendant himself had the opportunity to strike women from the jury, the defendant would have some cause to complain about the prosecutor's striking male jurors if male jurors tend to be more favorable toward defendants in paternity suits. But if men and women jurors are (as the Court thinks) fungible, then the only arguable injury from the prosecutor's "impermissible" use of male sex as the basis for his peremptories is injury to the stricken juror, not to the defendant. Indeed, far from having suffered harm, petitioner, a state actor under our precedents, see Georgia v. McCollum, 505 U. S. 42, 50-51 (1992); cf. Edmonson v. Leesville Concrete Co., 500 U. S. 614, 626-627 (1991), has himself actually inflicted harm on female jurors.[2] The Court today *159 presumably supplies petitioner with a cause of action by applying the uniquely expansive third-party standing analysis of Powers v. Ohio, 499 U. S. 400, 415 (1991), according petitioner a remedy because of the wrong done to male jurors. This case illustrates why making restitution to Paul when it is Peter who has been robbed is such a bad idea. Not only has petitioner, by implication of the Court's own reasoning, suffered no harm, but the scientific evidence presented at trial established petitioner's paternity with 99.92% accuracy. Insofar as petitioner is concerned, this is a case of harmless error if there ever was one; a retrial will do nothing but divert the State's judicial and prosecutorial resources, allowing either petitioner or some other malefactor to go free.
The core of the Court's reasoning is that peremptory challenges on the basis of any group characteristic subject to heightened scrutiny are inconsistent with the guarantee of the Equal Protection Clause. That conclusion can be reached only by focusing unrealistically upon individual exercises of the peremptory challenge, and ignoring the totality of the practice. Since all groups are subject to the peremptory challenge (and will be made the object of it, depending upon the nature of the particular case) it is hard to see how any group is denied equal protection. See id., at 423-424 (Scalia, J., dissenting); Batson v. Kentucky, 476 U. S. 79, 137-138 (1986) (Rehnquist, J., dissenting). That explains why peremptory challenges coexisted with the Equal Protection Clause for 120 years. This case is a perfect example of how the system as a whole is evenhanded. While the only claim before the Court is petitioner's complaint that the prosecutor struck male jurors, for every man *160 struck by the government petitioner's own lawyer struck a woman. To say that men were singled out for discriminatory treatment in this process is preposterous. The situation would be different if both sides systematically struck individuals of one group, so that the strikes evinced groupbased animus and served as a proxy for segregated venire lists. See Swain v. Alabama, 380 U. S. 202, 223-224 (1965). The pattern here, however, displays not a systemic sex-based animus but each side's desire to get a jury favorably disposed to its case. That is why the Court's characterization of respondent's argument as "reminiscent of the arguments advanced to justify the total exclusion of women from juries," ante, at 138, is patently false. Women were categorically excluded from juries because of doubt that they were competent; women are stricken from juries by peremptory challenge because of doubt that they are well disposed to the striking party's case. See Powers, supra, at 424 (Scalia, J., dissenting). There is discrimination and dishonor in the former, and not in the latterwhich explains the 106-year interlude between our holding that exclusion from juries on the basis of race was unconstitutional, Strauder v. West Virginia, 100 U. S. 303 (1880), and our holding that peremptory challenges on the basis of race were unconstitutional, Batson v. Kentucky, supra .
Although the Court's legal reasoning in this case is largely obscured by anti-male-chauvinist oratory, to the extent such reasoning is discernible it invalidates much more than sexbased strikes. After identifying unequal treatment (by separating individual exercises of peremptory challenge from the process as a whole), the Court applies the "heightened scrutiny" mode of equal protection analysis used for sexbased discrimination, and concludes that the strikes fail heightened scrutiny because they do not substantially further an important government interest. The Court says that the only important government interest that could be served by peremptory strikes is "securing a fair and impartial *161 jury," ante, at 137, and n. 8.[3] It refuses to accept respondent's argument that these strikes further that interest by eliminating a group (men) which may be partial to male defendants, because it will not accept any argument based on "`the very stereotype the law condemns.' " Ante, at 138 (quoting Powers, 499 U. S., at 410). This analysis, entirely eliminating the only allowable argument, implies that sexbased strikes do not even rationally further a legitimate government interest, let alone pass heightened scrutiny. That places all peremptory strikes based on any group characteristic at risk, since they can all be denominated "stereotypes." Perhaps, however (though I do not see why it should be so), only the stereotyping of groups entitled to heightened or strict scrutiny constitutes "the very stereotype the law condemns"so that other stereotyping (e. g., wide-eyed blondes and football players are dumb) remains OK. Or perhaps when the Court refers to "impermissible stereotypes," ante, at 139, n. 11, it means the adjective to be limiting rather than descriptiveso that we can expect to learn from the Court's peremptory/stereotyping jurisprudence in the future which stereotypes the Constitution frowns upon and which it does not.
Even if the line of our later cases guaranteed by today's decision limits the theoretically boundless Batson principle to race, sex, and perhaps other classifications subject to heightened scrutiny (which presumably would include religious belief, see Larson v. Valente, 456 U. S. 228, 244-246 (1982)), much damage has been done. It has been done, first and foremost, to the peremptory challenge system, which *162 loses its whole character when (in order to defend against "impermissible stereotyping" claims) "reasons" for strikes must be given. The right of peremptory challenge "`is, as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose.' " Lewis v. United States, 146 U. S. 370, 378 (1892), quoting Lamb v. State, 36 Wis. 424, 427 (1874). See also Lewis, supra, at 376; United States v. Marchant, 12 Wheat. 480, 482 (1827) (Story, J.); 4 W. Blackstone, Commentaries *353. The loss of the real peremptory will be felt most keenly by the criminal defendant, see Georgia v. McCollum, 505 U. S. 42 (1992), whom we have until recently thought "should not be held to accept a juror, apparently indifferent, whom he distrusted for any reason or for no reason." Lamb, supra, at 426. And make no mistake about it: there really is no substitute for the peremptory. Voir dire (though it can be expected to expand as a consequence of today's decision) cannot fill the gap. The biases that go along with group characteristics tend to be biases that the juror himself does not perceive, so that it is no use asking about them. It is fruitless to inquire of a male juror whether he harbors any subliminal prejudice in favor of unwed fathers.
And damage has been done, secondarily, to the entire justice system, which will bear the burden of the expanded quest for "reasoned peremptories" that the Court demands. The extension of Batson to sex, and almost certainly beyond, cf. Batson, 476 U. S., at 124 (Burger, C. J., dissenting), will provide the basis for extensive collateral litigation, which especially the criminal defendant (who litigates full time and cost free) can be expected to pursue. While demographic reality places some limit on the number of cases in which race-based challenges will be an issue, every case contains a potential sex-based claim. Another consequence, as I have mentioned, is a lengthening of the voir dire process that already burdens trial courts.
*163 The irrationality of today's strike-by-strike approach to equal protection is evident from the consequences of extending it to its logical conclusion. If a fair and impartial trial is a prosecutor's only legitimate goal; if adversarial trial stratagems must be tested against that goal in abstraction from their role within the system as a whole; and if, so tested, sex-based stratagems do not survive heightened scrutinythen the prosecutor presumably violates the Constitution when he selects a male or female police officer to testify because he believes one or the other sex might be more convincing in the context of the particular case, or because he believes one or the other might be more appealing to a predominantly male or female jury. A decision to stress one line of argument or present certain witnesses before a mostly female juryfor example, to stress that the defendant victimized womenbecomes, under the Court's reasoning, intentional discrimination by a state actor on the basis of gender.

* * *
In order, it seems to me, not to eliminate any real denial of equal protection, but simply to pay conspicuous obeisance to the equality of the sexes, the Court imperils a practice that has been considered an essential part of fair jury trial since the dawn of the common law. The Constitution of the United States neither requires nor permits this vandalizing of our people's traditions.
For these reasons, I dissent.
NOTES
[*] David H. Coburn, Stephanie A. Philips, and Marcia Greenberger filed a brief for the National Women's Law Center et al. as amici curiae urging reversal.
[1] The Federal Courts of Appeals have divided on the issue. See United States v. De Gross, 913 F. 2d 1417 (CA9 1990), and 960 F. 2d 1433, 1437 1443 (1992) (en banc) (extending Batson v. Kentucky, 476 U. S. 79 (1986), to prohibit gender-based peremptory challenges in both criminal and civil trials); cf. United States v. Nichols, 937 F. 2d 1257, 1262-1264 (CA7 1991) (declining to extend Batson to gender), cert. denied, 502 U. S. 1080 (1992); United States v. Hamilton, 850 F. 2d 1038, 1042-1043 (CA4 1988) (same), cert. dism'd, 489 U. S. 1094 (1989), and cert. denied, 493 U. S. 1069 (1990); United States v. Broussard, 987 F. 2d 215, 218-220 (CA5 1993) (same).

State courts also have considered the constitutionality of gender-based peremptory challenges. See Laidler v. State, 627 So. 2d 1263 (Fla. App. 1993) (extending Batson to gender); State v.Burch, 65 Wash. App. 828, 830 P.2d 357 (1992) (same, relying on State and Federal Constitutions); Di Donato v.Santini, 232 Cal. App. 3d 721, 283 Cal. Rptr. 751 (1991), review denied (Cal., Oct. 2, 1991); Tyler v. State, 330 Md. 261, 623 A. 2d 648 (1993) (relying on State Constitution); People v. Mitchell, 228 Ill. App. 3d 917, 593 N. E. 2d 882 (1992) (same), aff'd in part and vacated in relevant part, 155 Ill. 2d 643, 602 N. E. 2d 467 (1993); State v. Gonzales, 111 N. M. 590, 808 P. 2d 40 (App.) (same), cert. denied, 111 N. M. 590, 806 P. 2d 65 (1991); State v. Levinson, 71 Haw. 492, 498-499, 795 P. 2d 845, 849 (1990) (same); People v. Irizarry, 165 App. Div. 2d 715, 560 N. Y. S. 2d 279 (1990) (same); Commonwealth v. Hutchinson, 395 Mass. 568, 570, 481 N. E. 2d 188, 190 (1985) (same); cf. State v. Culver, 293 Neb. 228, 444 N. W. 2d 662 (1989) (refusing to extend Batson to gender); State v. Clay, 779 S. W. 2d 673, 676 (Mo. App. 1989) (same); State v. Adams, 533 So. 2d 1060, 1063 (La. App. 1988) (same), cert. denied, 540 So. 2d 338 (La. 1989); State v. Oliviera, 534 A. 2d 867, 870 (R. I. 1987) (same); Murphy v. State, 596 So. 2d 42 (Ala. Crim. App. 1991) (same), cert. denied, 596 So. 2d 45 (Ala.), cert. denied, 506 U. S. 827 (1992).
[2] There was one brief exception. Between 1870 and 1871, women were permitted to serve on juries in Wyoming Territory. They were no longer allowed on juries after a new chief justice who disfavored the practice was appointed in 1871. See Abrahamson, Justice and Juror, 20 Ga. L. Rev. 257, 263-264 (1986).
[3] In 1947, women still had not been granted the right to serve on juries in 16 States. See Rudolph, Women on JuriesVoluntary or Compulsory?, 44 J. Am. Jud. Soc. 206 (1961). As late as 1961, three States, Alabama, Mississippi, and South Carolina, continued to exclude women from jury service. See Hoyt v. Florida, 368 U. S. 57, 62 (1961). Indeed, Alabama did not recognize women as a "cognizable group" for jury-service purposes until after the 1966 decision in White v. Crook, 251 F. Supp. 401 (MD Ala.) (three-judge court).
[4] In England there was at least one deviation from the general rule that only males could serve as jurors. If a woman was subject to capital punishment, or if a widow sought postponement of the disposition of her husband's estate until birth of a child, a writ de ventre inspiciendo permitted the use of a jury of matrons to examine the woman to determine whether she was pregnant. But even when a jury of matrons was used, the examination took place in the presence of 12 men, who also composed part of the jury in such cases. The jury of matrons was used in the United States during the Colonial period, but apparently fell into disuse when the medical profession began to perform that function. See Note, Jury Service for Women, 12 U. Fla. L. Rev. 224, 224-225 (1959).
[5] Taylor distinguished Hoyt by explaining that that case "did not involve a defendant's Sixth Amendment right to a jury drawn from a fair cross section of the community," 419 U. S., at 534. The Court now, however, has stated that Taylor "in effect" overruled Hoyt. See Payne v. Tennessee, 501 U. S. 808, 828, n. 1 (1991).
[6] Because we conclude that gender-based peremptory challenges are not substantially related to an important government objective, we once again need not decide whether classifications based on gender are inherently suspect. See Mississippi Univ. for Women, 458 U. S., at 724, n. 9; Stanton v. Stanton, 421 U. S. 7, 13 (1975); Harris v. Forklift Systems, Inc., 510 U. S. 17, 26, n. (1993) (Ginsburg, J., concurring) ("[I]t remains an open question whether `classifications based on gender are inherently suspect' ") (citations omitted).
[7] Although peremptory challenges are valuable tools in jury trials, they "are not constitutionally protected fundamental rights; rather they are but one state-created means to the constitutional end of an impartial jury and a fair trial." Georgia v. McCollum, 505 U. S. 42, 57 (1992).
[8] Respondent argues that we should recognize a special state interest in this case: the State's interest in establishing the paternity of a child born out of wedlock. Respondent contends that this interest justifies the use of gender-based peremptory challenges, since illegitimate children are themselves victims of historical discrimination and entitled to heightened scrutiny under the Equal Protection Clause.

What respondent fails to recognize is that the only legitimate interest it could possibly have in the exercise of its peremptory challenges is securing a fair and impartial jury. See Edmonson v. Leesville Concrete Co., 500 U. S. 614, 620 (1991) ("[The] sole purpose [of the peremptory challenge] is to permit litigants to assist the government in the selection of an impartial trier of fact"). This interest does not change with the parties or the causes. The State's interest in every trial is to see that the proceedings are carried out in a fair, impartial, and nondiscriminatory manner.
[9] Respondent cites one study in support of its quasi-empirical claim that women and men may have different attitudes about certain issues justifying the use of gender as a proxy for bias. See R. Hastie, S. Penrod, & N. Pennington, Inside the Jury 140 (1983). The authors conclude: "Neither student nor citizen judgments for typical criminal case materials have revealed differences between male and female verdict preferences. . . . The picture differs [only] for rape cases, where female jurors appear to be somewhat more conviction-prone than male jurors." The majority of studies suggest that gender plays no identifiable role in jurors' attitudes. See, e. g., V. Hans & N. Vidmar, Judging the Jury 76 (1986) ("[I]n the majority of studies there are no significant differences in the way men and women perceive and react to trials; yet a few studies find women more defense-oriented, while still others show women more favorable to the prosecutor"). Even in 1956, before women had a constitutional right to serve on juries, some commentators warned against using gender as a proxy for bias. See F. Busch, Law and Tactics in Jury Trials § 143, p. 207 (1949) ("In this age of general and specialized education, availed of generally by both men and women, it would appear unsound to base a peremptory challenge in any case upon the sole ground of sex . . .").
[10] A manual formerly used to instruct prosecutors in Dallas, Texas, provided the following advice: "`I don't like women jurors because I can't trust them. They do, however, make the best jurors in cases involving crimes against children. It is possible that their "women's intuition" can help you if you can't win your case with the facts.' " Alschuler, The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts, 56 U. Chi. L. Rev. 153, 210 (1989). Another widely circulated trial manual speculated:

"If counsel is depending upon a clearly applicable rule of law and if he wants to avoid a verdict of `intuition' or `sympathy,' if his verdict in amount is to be proved by clearly demonstrated blackboard figures for example, generally he would want a male juror.
. . . . .
"[But] women . . . are desired jurors when plaintiff is a man. A woman juror may see a man impeached from the beginning of the case to the end, but there is at least the chance [with] the woman juror (particularly if the man happens to be handsome or appealing) [that] the plaintiff's derelictions in and out of court will be overlooked. A woman is inclined to forgive sin in the opposite sex; but definitely not her own." 3 M. Belli, Modern Trials §§ 51.67 and 51.68, pp. 446-447 (2d ed. 1982).
[11] Even if a measure of truth can be found in some of the gender stereotypes used to justify gender-based peremptory challenges, that fact alone cannot support discrimination on the basis of gender in jury selection. We have made abundantly clear in past cases that gender classifications that rest on impermissible stereotypes violate the Equal Protection Clause, even when some statistical support can be conjured up for the generalization. See, e. g., Weinberger v. Wiesenfeld, 420 U. S. 636, 645 (1975) (holding unconstitutional a Social Security Act classification authorizing benefits to widows but not to widowers despite the fact that the justification for the differential treatment was "not entirely without empirical support"); Craig v. Boren, 429 U. S. 190, 201 (1976) (invalidating an Oklahoma law that established different drinking ages for men and women, although the evidence supporting the age differential was "not trivial in a statistical sense"). The generalization advanced by Alabama in support of its asserted right to discriminate on the basis of gender is, at the least, overbroad, and serves only to perpetuate the same "outmoded notions of the relative capabilities of men and women," Cleburne v. Cleburne Living Center, Inc., 473 U. S. 432, 441 (1985), that we have invalidated in other contexts. See Frontiero v. Richardson, 411 U. S. 677 (1973); Stanton v. Stanton, supra; Craig v. Boren, supra; Mississippi Univ. for Women v. Hogan, supra. The Equal Protection Clause, as interpreted by decisions of this Court, acknowledges that a shred of truth may be contained in some stereotypes, but requires that state actors look beyond the surface before making judgments about people that are likely to stigmatize as well as to perpetuate historical patterns of discrimination.
[12] Given our recent precedent, the doctrinal basis for Justice Scalia's dissenting opinion is a mystery. Justice Scalia points out that the discrimination at issue in this case was directed at men, rather than women, but then acknowledges that the Equal Protection Clause protects both men and women from intentional discrimination on thebasis of gender. See post, at 157, citing Mississippi Univ. for Women v. Hogan, 458 U. S., at 723-724. He also appears cognizant of the fact that classifications based on gender must be more than merely rational, see post, at 160-161; they must be supported by an "exceedingly persuasive justification," Hogan, 458 U. S., at 724. Justice Scalia further admits that the Equal Protection Clause, as interpreted by decisions of this Court, governs the exercise of peremptory challenges in every trial, and that potential jurors, as well as litigants, have an equal protection right to nondiscriminatory jury selection procedures. See post, at 158-160, citing Batson, Powers, Edmonson, and McCollum. Justice Scalia does not suggest that we overrule these cases, nor does he attempt to distinguish them. He intimates that discrimination on the basis of gender in jury selection may be rational, see post, at 157, but offers no "exceedingly persuasive justification" for it. Indeed, Justice Scalia fails to advance any justification for his apparent belief that the Equal Protection Clause, while prohibiting discrimination on the basis of race in the exercise ofperemptory challenges, allows discrimination on the basis of gender. His dissenting opinion thus serves as a tacit admission that, short of overruling a decade of cases interpreting the Equal Protection Clause, the result we reach today is doctrinally compelled.
[13] It is irrelevant that women, unlike African-Americans, are not a numerical minority and therefore are likely to remain on the jury if each side uses its peremptory challenges in an equally discriminatory fashion. Cf. United States v. Broussard, 987 F. 2d, at 220 (declining to extend Batson to gender; noting that "[w]omen are not a numerical minority," and therefore are likely to be represented on juries despite the discriminatory use of peremptory challenges). Because the right to nondiscriminatory jury selection procedures belongs to the potential jurors, as well as to the litigants, the possibility that members of both genders will get on the jury despite the intentional discrimination is beside the point. The exclusion of even one juror for impermissible reasons harms that juror and undermines public confidence in the fairness of the system.
[14] The popular refrain is that all peremptory challenges are based on stereotypes of some kind, expressing various intuitive and frequently erroneous biases. See post, at 161. But where peremptory challenges are made on the basis of group characteristics other than race or gender (like occupation, for example), they do not reinforce the same stereotypes about the group's competence or predispositions that have been used to prevent them from voting, participating on juries,pursuing their chosen professions, or otherwise contributing to civic life. See Babcock, A Place in the Palladium, Women's Rights and Jury Service, 61 U. Cinn. L. Rev. 1139, 1173 (1993).
[15] Justice Scalia argues that there is no "discrimination and dishonor" in being subject to a race- or gender-based peremptory strike. Post, at 160. Justice Scalia's argument has been rejected many times, see, e. g., Powers v. Ohio, 499 U. S. 400, 410 (1991), and we reject it once again. The only support Justice Scalia offers for his conclusion is the fact that raceand gender-based peremptory challenges have a long history in this country. Post, at 159 (discriminatory peremptory challenges have "coexisted with the Equal Protection Clause for 120 years"); post, at 160 (there was a "106-year interlude between our holding that exclusion from juries on the basis of race was unconstitutional, [Strauder], and our holding that peremptory challenges on the basis of race were unconstitutional, [Batson] "). We do not dispute that this Court long has tolerated the discriminatory use of peremptory challenges, but this is not a reason to continue to do so. Many of "our people's traditions," see post, at 163,such as de jure segregation and the total exclusion of women from juries, are now unconstitutional even though they once coexisted with the Equal Protection Clause.
[16] For example, challenging all persons who have had military experience would disproportionately affect men at this time, while challenging all persons employed as nurses would disproportionately affect women. Without a showing of pretext, however, these challenges may well not be unconstitutional, since they are not gender or race based. See Hernandez v. New York, 500 U. S. 352 (1991).
[17] Respondent argues that Alabama's method of jury selection would make the extension of Batson to gender particularly burdensome. In Alabama, the "struck-jury" system is employed, a system which requires litigants to strike alternately until 12 persons remain, who then constitute the jury. See Ala. Rule Civ. Proc. 47 (1990). Respondent suggests that, in some cases at least, it is necessary under this system to continue striking persons from the venire after the litigants no longer have an articulable reason for doing so. As a result, respondent contends, some litigants may be unable to come up with gender-neutral explanations for their strikes.

We find it worthy of note that Alabama has managed to maintain its struck-jury system even after the ruling in Batson, despite the fact that there are counties in Alabama that are predominately African-American. In those counties, it presumably would be as difficult to come up with race-neutral explanations for peremptory strikes as it would be to advance gender-neutral explanations. No doubt the voir dire process aids litigants in their ability to articulate race-neutral explanations for their peremptory challenges. The same should be true for gender. Regardless, a State's choice of jury-selection methods cannot insulate it from the strictures of the Equal Protection Clause. Alabama is free to adopt whatever jury-selection procedures it chooses so long as they do not violate the Constitution.
[18] The temptation to use gender as a pretext for racial discrimination may explain why the majority of the lower court decisions extending Batson to gender involve the use of peremptory challenges to remove minority women. All four of the gender-based peremptory cases to reach the Federal Courts of Appeals and cited in n. 1, supra, involved the striking of minority women.
[19] This Court almost a half century ago stated:

"The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. . . . This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury." Thiel v. Southern Pacific Co., 328 U. S. 217, 220 (1946).
[*] See Georgia v. McCollum, 505 U. S. 42 (1992) (blacks); Hernandez v. New York, 500 U. S. 352 (1991) (Latinos); Edmonson v. Leesville Concrete Co., 500 U. S. 614 (1991) (blacks); Powers v. Ohio, 499 U. S. 400, 404-405 (1991) (blacks); Holland v. Illinois, 493 U. S. 474, 476-477 (1990) (blacks); Griffith v. Kentucky, 479 U. S. 314, 316 (1987) (blacks); Allen v. Hardy, 478 U. S. 255, 259 (1986) (blacks and Hispanics).
[1] Throughout this opinion, I shall refer to the issue as sex discrimination rather than (as the Court does) gender discrimination. The word "gender" has acquired the new and useful connotation of cultural or attitudinal characteristics (as opposed to physical characteristics) distinctive to the sexes. That is to say, gender is to sex as feminine is to female and masculine to male. The present case does not involve peremptory strikes exercised on the basis of femininity or masculinity (as far as it appears, effeminate men did not survive the prosecution's peremptories). The case involves, therefore, sex discrimination plain and simple.
[2] I continue to agree with Justice O'Connor that McCollum and Edmondson erred in making civil litigants and criminal defendants state actors for purposes of the Equal Protection Clause. I do not, however, share her belief that correcting that error while continuing to consider the exercise of peremptories by prosecutors a denial of equal protection will make things right. If, in accordance with common perception but contrary to the Court's unisex creed, women really will decide some cases differently from men, allowing defendants alone to strike jurors on the basis of sex will produceand will be seen to producejuries intentionally weighted in the defendant's favor: no women jurors, for example, in a rape prosecution. That is not a desirable outcome.
[3] It does not seem to me that even this premise is correct. Wise observers have long understood that the appearance of justice is as important as its reality. If the system of peremptory strikes affects the actual impartiality of the jury not a bit, but gives litigants a greater belief in that impartiality, it serves a most important function. See, e. g., 4 W. Blackstone, Commentaries *353. In point of fact, that may well be its greater value.