STATE of Missouri, Respondent,

v.

Odessa BROWN, Appellant.

No. WD 53132.

Missouri Court of Appeals,
Western District.

Dec. 9, 1997.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 27, 1998.

James C. Cox, Asst. Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before ULRICH, C.J., and SPINDEN and SMART, JJ.

ULRICH, Chief Judge, Presiding Judge.

Odessa Brown appeals her convictions following jury trial for second degree murder, section 565.021, RSMo 1994, and armed criminal action, section 571.015, RSMo 1994, and concurrent terms of life imprisonment. Ms. Brown raises two points of error on appeal. She contends the trial court erred in (1) instructing the jury with an accomplice liability theory where the evidence showed she acted alone and where she was prevented from introducing any evidence that someone else was responsible for the murder; and (2) overruling her *Batson* challenge to the prosecution's removal of a Hispanic venireperson. The judgment of convictions is affirmed.

## FACTS

Sixty-six year old David Watkins was living alone in Kansas City, Missouri in September of 1995. Mr. Watkins entertained a group of people in his home the evening of September 22, 1995. Pamela Pitkins and her aunt, Beverly Roper, arrived first, and Charles Smith joined the group a short time later. Odessa Brown arrived even later with her baby. The group began drinking and smoking crack cocaine, marijuana and primo, a mixture of crack cocaine and marijuana.

Mr. Smith departed Mr. Watkins's home at approximately 1:00 a.m. After Mr. Smith left, Ann Sanders and Vickie Crowe arrived. The group continued to smoke and drink. Mr. Watkins showed the group a roll of money and stated he had won $3,100.00 at the river boats. Mr. Watkins then put the money in a shaving kit and stuck it in the oven for safekeeping. Between 2:00 a.m. and 4:00 a.m., Ms. Sanders, Ms. Crowe, Ms. Pickens and Ms. Roper went home leaving Ms. Brown, her baby and Mr. Watkins alone.

The next day, Saturday, September 23, 1995, Ms. Pickens realized she had left her purse at Mr. Watkins home the night before. She called Mr. Watkins's home repeatedly between 1:00 p.m. and 9:00 p.m. without receiving an answer and Mr. Watkins's answering machine never activated.

Mr. Watkins usually attended Ms. Pickens's children when she was not home. Ms. Pickens's three children went to Mr. Watkins's home on Saturday, September 23, 1995, at 6:00 p.m. after attending a church picnic. When they arrived at Mr. Watkins's home, a woman answered the door and informed them that Mr. Watkins was not at home. One of the children, Tony, informed the woman that they were supposed to wait at Mr. Watkins's home for their mother, but the woman would not permit the children to enter the house. While the children were speaking with the woman, Tony noticed a man carrying a television set out of Mr. Watkins's home to a car parked across the street. A woman held the trunk of the vehicle open for the man so that he could put the television set inside it. Because the woman at the door would not let them in, the children departed Mr. Watkins's home.

Ms. Pickens resumed calling Mr. Watkins's home at 10:30 a.m. the next day, but did not receive an answer. Ms. Pickens walked to Mr. Watkins' home to retrieve her purse.

When she arrived at his home, she noticed the front door was locked. When nobody answered the door, Ms. Pickens used a key Mr. Watkins had given her to gain entrance to his home. Upon entering the house, Ms. Pickens smelled natural gas and noticed that Mr. Watkins television set and her purse were missing. She also noticed that the house was "tore up." As Ms. Pickens walked into the kitchen to turn the gas off she noticed Mr. Watkins's feet sticking out from under a bed. Ms. Pickens immediately called 911 and ran out of the house to summon a neighbor, Teresa Quintaro, who lived two doors away.

Ms. Quintaro returned with Ms. Pickens to Mr. Watkins's home. Ms. Quintaro noticed Mr. Watkins was covered with dried blood, was cold and manifested no vital signs. When Ms. Quintaro's husband arrived, Ms. Quintaro told him that Mr. Watkins was dead and asked him to call 911 too.

Officer Donald Lee of the Kansas City Police Department was the first officer to arrive at Mr. Watkins's home. When Officer Lee entered the residence, he noticed a strong odor of natural gas, a lit candle in the living room, a small dog tied to a chair in the living room and Mr. Watkins lying on the floor of the bedroom. Officer Lee noticed a laceration on Mr. Watkins's throat and dried blood covering his face and neck. Officer Lee went into the kitchen and shut off the gas burners on the stove while his partner blew out the candle.

Crime investigators went to Mr. Watkins's home the same day to take photographs and collect evidence. The investigators discovered several bloody footprints on the kitchen floor and in the bathroom. The investigators also discovered a broken metal blade and the shaving kit, minus the $3,100.00, on the kitchen floor. Strands of hair were collected from Mr. Watkins's chest and shoulders. Additionally, a clump of hair that Mr. Watkins was clutching in his left hand was taken. Footprints were lifted from various locations within Mr. Watkins's home.

Dr. Thomas Young conducted an autopsy of Mr. Watkins's body. He determined that Mr. Watkins died sometime in the morning or early afternoon of Saturday, September 23, 1995, within minutes of being repeatedly stabbed in the neck. Dr. Young noted that Mr. Watkins had been stabbed ten times in the neck and had superficial cuts on his face and neck. Mr. Watkins also showed signs of blunt injuries to his shoulders and back indicating sustained pressure had been applied to that area of his body. The type and nature of his injuries suggested Mr Watkins had been stabbed during a struggle but because he suffered from emphysema, a chronic lung disease, his ability to sustain a lengthy struggle might have been severely limited.

Detectives Laurie Borkowski and Alissa Prince were assigned to investigate Mr. Watkins's death. The detectives took photographs to Tony Pickens on Monday, September 25, to determine if he could identify the man who had taken the television set from Mr. Watkins's home. Tony identified William Harvey.

Detectives Borkowski and Prince played the tape on Mr. Watkins's answering machine and began contacting all of the callers they were able to identify. Ms. Brown had left her name on the answering machine and the detectives located her telephone number in Mr. Watkins's address book. Ms. Brown met with the detectives on Tuesday, September 26, and voluntarily gave the police a hair sample, fingerprints, foot impressions, a pair of white tennis shoes and allowed a police officer to photograph her.

Ms. Brown told the police that a friend, Derrick Carr, took her to Mr. Watkins's home at 10:00 p.m. on Saturday, September 23. She stated that Ms. Pickens, Ms. Roper, Ms. Crowe, Ms. Sanders, Mr. Smith and Mr. Watkins were present. Ultimately, Mr. Smith and the four women left, and she went downstairs with her baby to sleep. While she was downstairs sleeping, she heard a knock at the door and heard Mr. Watkins say, "come in." She heard sounds of a male and a female talking and then heard the sound of "something fall." During the night, someone came down the stairs, peeked through the open doorway at her, "gasped at her," closed the door and went back upstairs. Late Saturday morning, she went upstairs to use the bathroom and realized she had

stepped in something wet and was leaving footprints while she walked. When she attempted to find what she had stepped in, she noticed Mr. Watkins's body. Ms. Brown stated she was so upset she went to the kitchen to retrieve a bottle of gin and began drinking. She acquired her belongings, left the house, and walked to a park. She then got a ride home from an unknown male.

The detectives took photographs of several women to Tony Pickens on Tuesday, September 26. The photographic lineup included a picture of Ms. Brown but Tony identified Vickie Crowe as the women he had seen at Mr. Watkins's home on Saturday, September 23.

Robert Booth, a forensic chemist, examined hair and blood samples taken from the crime scene. Mr. Booth compared samples of hair taken from Mr. Watkins's body with samples taken from Ms. Brown, Ms. Pickens, Ms. Crowe, Ms. Sanders, Mr. Harvey and Mr. Thompson Love. The forensic tests disclosed that hair samples recovered from Mr. Watkins's left hand and cheek resembled Ms. Brown's hair and did not match the hair strands of Ms. Pickens, Ms. Crowe, Ms. Sanders, Mr. Harvey or Mr. Love. Hair recovered from Mr. Watkins's right shoulder was indistinguishable from Ms. Brown's hair and did not match any of the other persons' hair. Hair recovered from Mr. Watkins's left leg did not match any of the hair he compared including Ms. Brown. The tuft of hair taken from Mr. Watkins's left hand matched Ms. Brown's hair and did not match any of the others' hair.

The detectives met with Ms. Brown again on Wednesday, September 27. Ms. Brown recanted the version of events she had told the detectives the day before. When the detectives told Ms. Brown that her hair had been found on Mr. Watkins's hands and body, Ms. Brown told the detectives she left a hair brush at Mr. Watkins's home. Ms. Brown then began crying and told the detectives she wanted police protection. She then stated that while she was in the basement, she heard Mr. Watkins cry out in pain. When she went upstairs, she saw a man rifling through the pockets of a pair of pants on a chair in Mr. Watkins's living room.

When the man saw her, he grabbed her, threw her on the coach and threatened to kill her. Ms. Brown's baby then began crying and Ms. Brown and the man went down the basement steps to get the baby. The man then took an envelope with Ms. Brown's name and address on it from her purse, copied down the information and told her he knew where she lived. Ms. Brown heard a female in the kitchen asking for a lighter. Ms. Brown described the woman as a stocky with her hair in a french braid in the back. The man and woman left the house in Mr. Watkins's truck. After they had left, Ms. Brown stated she went to Mr. Watkins to cover him with a blanket, and in his dying breath, he reached up and grabbed her hair. Ms. Brown then stated that she went to the kitchen to retrieve a bottle of gin, gathered her things and left. Ms. Brown stated she walked home.

After their Wednesday conversation with Ms. Brown, the detectives discovered that Ms. Brown had taken Mr. Watkins's truck from his home on Saturday, September 23. When questioning Ms. Brown again, the detectives noted that she had failed to tell them about her taking Mr. Watkins's truck. She said she had not mentioned this fact because she was afraid of being charged with stealing the truck. She stated that because the day was cold, her baby was with her and she did not have any money, she had used the truck to drive home.

The detectives then asked Ms. Brown to tell them again about what happened at Mr. Watkins's home. Ms. Brown began crying and stated that she had actually seen Mr. Watkins being stabbed. She stated that when she came upstairs after hearing the noise, she saw a man kneeling over Mr. Watkins making stabbing motions. When the man saw her, he threw her on top of Mr. Watkins while he stabbed him. Ms. Brown recounted how the man then threw her on the coach. After the man and woman left, Ms. Brown left Mr. Watkins's house in his pickup. Ms. Brown drove to a grocery store and dumped her shirt and the baby's sleeper in the dumpster because they had blood on them. After driving awhile, Ms. Brown parked the truck and began walking home.

On her way home, she saw a man named Gerald who asked if he could buy the truck. Ms. Brown told Gerald where the truck was parked and where he could find the keys. Ms. Brown told the detectives she did not tell them of this earlier because she did not want to have to testify in court. Ms. Brown gave the detectives directions to where she had thrown the keys; the detectives found Mr. Watkins's keys in that location.

The homicide unit received an anonymous call from a woman who claimed to have information about Mr. Watkins's death. The woman stated that the man who had killed Mr. Watkins had also stolen her daughter's violin. She also stated that Ms. Brown had stolen Mr. Watkins's television set. Detectives Borkowski and Prince determined that the anonymous call had been made by Emma Wells.

Detectives Borkowski and Prince talked with Ms. Wells and her boyfriend, Thompson Love. Ms. Wells and Mr. Love stated that on Saturday, September 23, Mr. Love got off work between 1:30 and 3:00 p.m. and went to pick up Ms. Wells and their children. Mr. Love said that later that afternoon, Ms. Brown paged him to ask if he knew anyone who wanted a television set. Mr. Love and Ms. Wells went to Mr. Watkins's home. Mr. Love looked at the television set and paid Ms. Brown $40.00 for it. Ms. Wells opened the trunk of the vehicle so that Mr. Love could put the television set inside. While he was carrying the television set to his car, Ms. Wells noticed three children coming to Mr. Watkins's door. Mr. Love later sold the television set at a fish market for $60.00.

Based on this new information, Detectives Borkowski and Prince met with Ms. Brown on October 25, 1995. The detectives informed Ms. Brown what Mr. Love had stated. The detectives showed her a photo spread containing pictures of Mr. Love and Ms. Wells. While Ms. Brown initially denied recognizing anyone in the photo spread, she later admitted to knowing Mr. Love. Ms. Brown told the detectives she had called Mr. Love for a ride on Saturday, September 23. When he got to the house, he sat in the living room and saw the television set. He asked Ms. Brown if the television was for sale.

When she stated she did not care what he did with the television, Mr. Love took the television and left. While Mr. Love was at the house, some children came to see Mr. Watkins, but Ms. Brown denied them access. After darkness fell, Ms. Brown took Mr. Watkins's truck and left.

The bloody footprints found at Mr. Watkins's home were of the same size and had the same ball-toe configuration as Ms. Brown's feet. Five of the fifteen identifiable fingerprints from the crime scene matched Ms. Brown's fingerprints. The remaining ten prints did not match either Mr. Harvey, Mr. Love, Ms. Wells or Mr. Watkins.

Ms. Brown was charged with second degree murder, section 565.0221.1, RSMo 1994 and armed criminal action, section 571.015, RSMo 1994. The case proceeded to trial on June 3, 1996. Following voir dire examination of the venire panel and challenges for cause by both parties, Ms. Brown objected to the state's peremptory strike of a Hispanic female. The state argued that it struck the venireperson because she stated that her husband served time in jail, she thought the imprisonment was unfair and that the prosecutor had been unfair to her family. Ms. Brown argued that the state's reason was pretextual because several other venirepersons indicated that they too had family members in prison. Ms. Brown argued that the stricken venireperson had never stated she thought her husband's incarceration was unfair but rather that she did not think the punishment fit the crime and that the punishment, although harsh, was good because it resulted in her husband no longer using drugs. Ms. Brown noted that another venireperson, a Caucasian female, was not stricken after she stated that she did not know if her brother-in-law's punishment was too severe. The prosecution countered that because only two peremptory strikes were permitted, the prosecution was not able to strike all the venirepersons they would have liked to strike. The trial court noted that an identified black female venireperson indicated that she too had family members in prison and that she was not stricken. The court then overruled the challenge.

During the jury instruction conference, the state submitted verdict directors for murder in the second degree and armed criminal action, charging that Ms. Brown had acted either alone or in concert with others in committing these offenses. The state also submitted an instruction which defined "acting in concert." Ms. Brown objected to these instructions, arguing that insufficient evidence had been presented to support an acting in concert theory and that the court would not allow Ms. Brown to show that anyone else had the opportunity to commit the crimes. The court overruled the objection. The jury found Ms. Brown guilty of both counts and recommended punishment of life imprisonment on both counts. The court ordered the sentences to run concurrently. This appeal followed.

## I. WHETHER THE TRIAL COURT ERRED BY INSTRUCTING THE JURY UNDER AN ACCOMPLICE LIABILITY THEORY

■ As her first point on appeal, Ms. Brown argues that the trial court erred when it instructed the jury under an accomplice liability theory. Ms. Brown specifically argues no evidence to support an accomplice liability theory was presented and that she was prejudiced by the trial court's refusal to let her introduce evidence that other unnamed persons had the opportunity to kill Mr. Watkins.

■ An instruction should not be given if no evidence was presented to support it. *State v. Daugherty*, 631 S.W.2d 637, 639 (Mo. 1982). Instructions must be supported by substantial evidence and its reasonable inferences. *Id.* To submit an accomplice liability theory to the jury, the evidence must have supported a finding that (1) someone killed Mr. Watkins; (2) the person acted with the intent to cause serious physical injury; and (3) with the purpose of furthering the commission of the murder, Ms. Brown acted together with or aided and encouraged the other person. *State v. Grim*, 854 S.W.2d 403, 413 (Mo.1993), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993).

In *Grim*, the defendant challenged the court's submission of a first degree murder instruction on an aiding and abetting theory. *Id.* The court found that the first two elements were established because the victim was stabbed by someone, and whoever did it intended serious physical injury. *Id.* The court found that the third element was established because the defendant's thumbprint was in the victim's blood. *Id.* The court stated that while this evidence supported the inference that the defendant actually stabbed the victim, it could also infer that he helped the person with the knife. *Id.* Thus, the court found no error in the submission of an accomplice liability theory. *Id.*

Here, too, all the elements for an accomplice liability theory were established by the state. As in *Grim*, the first element was met because the evidence showed that someone killed Mr. Watkins. As in *Grim*, the second element was met because whoever killed Mr. Watkins intended to inflict death or serious bodily by the act of repeatedly stabbing him in the throat with a knife. The third element was likewise supported by the evidence. As Ms. Brown concedes, the evidence was sufficient for the jury to find that she acted alone in the killing. The evidence established that she was the last person to see Mr. Watkins alive; Ms. Brown's fingerprints were throughout the house; Ms. Brown's footprints in Mr. Watkins blood were located throughout his home; Mr. Watkins had grabbed a clump of hair identical to Ms. Brown's hair during a struggle; $3,100.00 of Mr. Watkins's money was missing and he had shown her where he hid that money; Ms. Brown attempted to conceal the homicide after its commission; and Ms. Brown repeatedly altered her account of the events that occurred at the murder scene, when the murder occurred and thereafter, making increasingly incriminating statements to the investigating detectives. While this evidence was sufficient to establish Ms. Brown acted alone in Mr. Watkins's killing, the evidence was not conclusive as to that issue. If the jury believed Ms. Brown's statements that a man and a woman with a french braid were present when the murder occurred the jury could have inferred that Ms. Brown only assisted them in the killing rather than acted alone. Because the evidence supported a

jury verdict that Ms. Brown had killed Mr. Watkins either by herself or with others, the trial court did not err in submitting an accomplice liability theory.

 Even *assuming arguendo*, that insufficient evidence was presented to support an accomplice theory, Ms. Brown failed to establish the requisite prejudice. When instructional error arises, prejudice is judicially determined by considering the facts and instructions together. *State v. Feltrop*, 803 S.W.2d 1, 8 (Mo. banc 1991), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). Ms. Brown contends that prejudice is established by the trial court's refusal to let her introduce evidence that someone else killed Mr. Watkins.[1] Evidence that another person had an opportunity or motive for committing the crime for which the defendant is being tried is not admissible without proof that such other person committed some act directly connecting him with the crime. *State v. Shepherd*, 903 S.W.2d 230, 232 (Mo. App.1995). Evidence that has no other effect than to cast bare suspicion on another is not admissible. *Id.*

Ms. Brown sought to introduce evidence that Mr. Watkins's checkbook had been stolen the same week as the murder; someone had tried to cash one of his stolen checks; a few days before Mr. Watkins's death Monica Gleason borrowed Mr. Watkins's truck and did not return it; and Ms. Gleason's boyfriend, Demitrius Davis, inquired as to Mr. Watkins's financial situation, whereupon Ms. Gleason stated that she wanted Mr. Watkins to be her "sugar daddy." In making this offer of proof, Ms. Brown, however, failed to introduce any evidence that Ms. Gleason, Mr. Davis or the person that stole Mr. Watkins's checkbook were in any way connected with Mr. Watkins's death. Nor did the police uncover any evidence that Ms. Gleason, Mr. Davis or anyone who stole Mr. Watkins's checkbook were connected to the crimes charged. Such offers of proof, without evidence that the persons are connected with the crimes charged, are insufficient to warrant submission of the evidence to the jury. Ms. Brown's failure to introduce any evidence that Ms. Gleason or Mr. Davis committed any act directly connecting them with the crime warranted the denial of her offer of proof. *State v. Mansfield*, 891 S.W.2d 854, 856 (Mo.App.1995). Point one is denied.

## II. *BATSON* CHALLENGE

Ms. Brown contends as her second point on appeal that the trial court erred in overruling her *Batson* challenge to the state's use of peremptory strikes to remove a Hispanic venireperson from the jury. Ms. Brown contends that the prosecution's race-neutral reason was pretextual because similarly situated venirepersons were not peremptorily stricken and because the proffered reason was not logically relevant.

 The Equal Protection Clause prohibits the prosecutor's use of peremptory challenges to exclude jurors on the basis of race or gender. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986); *accord J.E.B. v. Alabama ex. rel. T.B.*, 511 U.S. 127, 128–29, 114 S.Ct. 1419, 1421–22, 128 L.Ed.2d 89 (1994). The trial court's determination regarding purposeful discrimination in the exercise of peremptory strikes is a finding of fact that should not be disturbed on appeal unless clearly erroneous. *State v. Griffin*, 756 S.W.2d 475, 482 (Mo. banc 1988), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989). To be clearly erroneous, the reviewing court must have a firm and definite impression that a mistake has been made. *Id.*

 Under the procedural guidelines established by the Missouri Supreme Court in *State v. Parker*, 836 S.W.2d 930, 939–40 (Mo. banc 1992), *cert. denied*, 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992), if a prosecutor's use of peremptory strike is challenged in a timely fashion on the ground that the prosecutor has engaged in race discrimination, the prosecutor is obligated to give a valid race-neutral explanation for the state's

[1] Ms. Brown also contends prejudice was established because the state failed to present any evidence from which the jury could have inferred Ms. Brown was guilty under an accomplice liability theory and, hence, she was denied the opportunity to defend herself. As discussed above, however, evidence was presented from which the jury could have inferred Ms. Brown acted as an accomplice in Mr. Watkins's murder. Ms. Brown had the opportunity to defend herself against this evidence and thus, no prejudice resulted.

strike regardless of whether there exists a *prima facie* case of such discrimination. *State v. Jackson,* 925 S.W.2d 856, 863 (Mo. App.1996). The explanation need not be plausible or persuasive, and it is presumed to be race-neutral unless a discriminatory intent is inherent in the explanation. *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). If the prosecutor articulates race-neutral reasons, the burden shifts back to the defendant to show that the state's proffered reasons were merely pretextual and, in fact, racially motivated. *Jackson,* 925 S.W.2d at 864. If the defendant makes such a showing, the trial court must decide if purposeful racial discrimination has been proven. *Id.*

■ The prosecution struck a Hispanic female from the panel because her husband had served time in prison, she thought the imprisonment was unfair, and she thought that the prosecutor had been unfair to her family. Ms. Brown timely challenged the state's use of a peremptory challenge as to the venireperson. Ms. Brown concedes the state's reason for striking the venireperson was race-neutral. *See, e.g., State v. Antwine,* 743 S.W.2d 51, 66 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988)(holding that striking of venireperson because a relative or friend is serving or has served time in jail is a legitimate non-racial reason for striking venireperson); *State v. Tomlin,* 864 S.W.2d 364, 367 (Mo.App.1993) (same). Because the state proffered a raceneutral explanation for the strike, Ms. Brown must show that the state's proffered reason was pretextual.

■ Ms. Brown argues that the state's reason for striking the panel member was pretextual because two other venirepersons indicated that they, too, had family members in prison. Ms. Brown's analogy of the stricken venireperson to the other two nonstricken venirepersons, however, is not persuasive as neither of the unstricken venirepersons were similarly situated. Primarily, while the stricken venireperson indicated her husband served jail time, one of the unstricken jurors did not have a close relative who served jail time. Rather her future brother-in-law had been convicted of a crime and his incarceration was served in a halfway house, not a jail or prison. More importantly, the juror did not feel the punishment of her brother-in-law was too severe while the stricken venireperson twice indicated she thought the punishment imposed on her husband was too severe. Similarly, while the second unstricken venireperson indicated her brother had served time in a federal penitentiary for armed robbery, she did not think his punishment was too severe. Because only the stricken venireperson indicated a personal dissatisfaction with the judicial system, the unstricken venirepersons were not similarly situated with the unstricken venireperson.

■ Ms. Brown also contends that the state's reasons for peremptorily striking identified venireperson were not logical and, hence, must have been racially motivated. Analysis of the evidence, however, illustrates that the prosecutor did have a logical reason for exercising the peremptory strike. The stricken venireperson indicated a personal dissatisfaction with the judicial system. She indicated that her experience with prosecutors had been negative and that she thought the punishment her husband received was too harsh. The prosecutor had ample reason to infer that the venireperson's negative experience and her negative views of prosecutors and prison sentences could affect her ability to neutrally assess the evidence against Ms. Brown. Additionally, the trial court had the opportunity to observe the prosecutor's demeanor and to assess his credibility and found the prosecutor's reason legitimate. A reviewing court affords great deference to such a finding since the finding turns largely on an evaluation of credibility. *State v. Wilhite,* 858 S.W.2d 293, 296 (Mo. App.1993). Having articulated a legitimate reason that was not racially motivated, the prosecution satisfied the mandates of the Constitution. *Purkett,* 514 U.S. at 768, 115 S.Ct. at 1771. The trial court, therefore, did not err in overruling Ms. Brown's *Batson* challenge as to the stricken venireperson. Point two is denied.

The judgment of convictions is affirmed.

All concur.