IRVING, J„
 

 for the Court:
 

 ¶ 1. This appeal arises out of Vandarren McCray’s conviction in the Coahoma County Circuit Court for aggravated assault and resulting fifteen-year sentence. After McCray has served ten years of his fifteen-year sentence, he will be placed on five years of post-release supervision. Feeling aggrieved, McCray appeals and asserts that: (1) the circuit court erred in excluding hearsay evidence; (2) the circuit court erred in failing to declare a mistrial in response to remarks made by the prosecutor during closing argument; (3) the State improperly used peremptory strikes in violation of
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); and (4) the cumulative effect of the errors requires a reversal and the remand of McCray’s case.
 

 ¶ 2. Finding no reversible error, we affirm the judgment of the circuit court.
 

 FACTS
 

 ¶ 3. On November 25, 2005, a large crowd had gathered outside Mac’s Lounge in Clarksdale, Mississippi. Witnesses indicated that a fight was taking place between Derrick Ross and another individual called “Shandaman.” Byron Ross, Derrick’s brothei1, was part of the crowd that had gathered outside Mac’s Lounge due to the altercation. During the confrontation, Byron was shot in the side. The police learned that McCray was Byron’s alleged assailant.
 

 ¶ 4. Byron’s sister, Maria Ross, testified at trial. She stated that she was watching Derrick and Shandaman fight when a white vehicle pulled up to the scene. She testified that a man named Walter Conner was driving the vehicle and that McCray was a passenger. She explained that McCray and Conner both exited the vehicle and that Conner and another individual then got into an argument. Maria stated that she was attempting to get Byron and a friend to leave when she observed McCray with a silver gun in his hand. Maria testified that she saw McCray fire one shot toward her and Byron, at which time she ran from the parking lot. She stated: “I think it was an automatic because he shot, he fired one shot, that’s when I started running again. A few seconds later, pow, pow, pow, pow, pow.” Maria did not learn until later that Byron had been shot and was in the hospital. During cross-examination, Maria was asked if she is friends with McCray. She explained: “I mean, I’m not going to sit here and lie on him. [McCray] is a pretty good boy. I mean, he talks to me pretty decent.... You know, he told me that he didn’t try to do it.”
 

 ¶ 5. Derrick testified at trial that he was fighting when Conner’s vehicle arrived. He explained that he was still fighting when he heard a gunshot. He testified that he looked around and saw McCray, whom he knew as “Poncho,” with a gun. Derrick stated that McCray fired several more shots, at which time Derrick ran from the scene. Like Maria, Derrick later learned that Byron had been shot and was at the hospital.
 

 ¶ 6. At trial, Byron testified that he had observed Conner hand McCray a handgun, which McCray put in his pocket. Byron described the handgun as “shiny,” although he could not identify the size or type of handgun. Byron stated that he was asking McCray to “chill out” when McCray shot him. Byron indicated that he and McCray had a few people that they
 
 *1048
 
 were both Mends with and that they had spent time around each other as a result. Regarding the shooting, Byron testified: “So instead of [McCray] chilling out, he pulled out the gun and cocked it. He paused for a minute and he looked at me and he shot me on the first shot in my side.” Byron explained that he grabbed his side and ran from the parking lot while McCray fired several more shots. Byron explained that he was able to flag down the car of an acquaintance, who took him to the hospital. Byron testified that he was in the hospital for approximately a month and that he had surgery on his stomach, small intestine, and large intestine. During cross-examination, the defense attorney attempted to get Byron to agree that Byron did not know that McCray had shot him, only that McCray had had a gun that night. Byron disagreed: “Ma’am, I know he shot me. Eye-to-eye contact. I saw him shoot me. It ain’t no, what I know. It’s something I know. It ain’t about what I think. It’s what I know.”
 

 ¶ 7. At trial, testimony was elicited indicating that Byron and Derrick have been or are currently involved with the Vice Lords, a gang in Clarksdale. Although McCray denied it, there was testimony from the State’s witnesses that McCray is involved with the Gangster Disciples, a rival gang. However, no witness claimed that the shooting was the result of gang violence.
 

 ¶ 8. McCray testified in his own defense. He admitted that he was at the scene of the shooting, but denied shooting Byron. McCray denied having a handgun in his possession that night and presented several witnesses who testified that they were with him that night but did not see him with a handgun. McCray and his witnesses also denied that McCray arrived at the scene that night with Conner. Jonathan Chapmon testified that he knows both McCray and Byron and that he lives in the same apartment complex as McCray. Chapmon further testified that he had a gathering at his apartment in 2007 that McCray and Byron both attended. Byron denied attending any such gathering, although McCray presented an additional witness, Andrae Whitfield, who testified that both McCray and Byron were present at such a gathering in 2007. Chapmon stated that Byron and McCray seemed to get along fine at the 2007 gathering. During a proffer of testimony outside of the jury’s presence, Chapmon testified that it was his “understanding” after that day that Byron knew that McCray was not his assailant.
 

 ¶ 9. After deliberating, the jury found McCray guilty of aggravated assault. It is from that conviction that McCray appeals.
 

 ¶ 10. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 1. Exclusion of Hearsay Evidence
 

 ¶ 11. When reviewing a trial court’s decision to admit or exclude evidence, our standard of review is whether the court committed an abuse of its discretion.
 
 Miller v. State,
 
 996 So.2d 752, 756 (¶ 12) (Miss.2008). As our supreme court has explained: “a trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, [an appellate court] will not reverse this ruling.”
 
 Williams v. State,
 
 991 So.2d 593, 597 (¶ 8) (Miss.2008) (quoting
 
 Shaw v. State,
 
 915 So.2d 442, 445 (¶ 8) (Miss.2005)).
 

 ¶ 12. The exclusion of which McCray complains is the trial court’s decision to
 
 *1049
 
 refuse to allow Chapmon to testify regarding Byron’s alleged statement that he knew that McCray was not his assailant.
 

 ¶ 13. McCray alleges in his appellate brief that the statement should have been allowed as a statement regarding identity. According to Rule 801(d)(1)(C) of the Mississippi Rules of Evidence: “A statement is not hearsay if ... [t]he declarant testifies at the trial ... and is subject to cross-examination concerning the statement, and the statement is ... one of identification of a person made after perceiving the person.” McCray’s contention fails for two reasons.
 

 ¶ 14. First, this issue is procedurally barred for failure to raise it at the trial level. Although McCray attempted to have Chapmon’s testimony introduced, the only ground that was presented to the trial court as to why the statement was not inadmissible hearsay was that it was a prior inconsistent statement. In order to preserve such an error for appeal, “a timely objection or motion to strike [must appear] of record, stating the specific ground of objection.... ” M.R.E. 103(a)(1). The statement’s admissibility as a statement of identification was never raised before the circuit court. Therefore, this issue is procedurally barred.
 

 ¶ 15. Furthermore, even were this issue not procedurally barred, it is without merit. Quite simply, the proffer of Chap-mon’s testimony fails to show that Chap-mon would have testified that Byron identified someone other than McCray as his attacker or that Byron stated that McCray was not his attacker. For thoroughness’s sake, we quote at length from the proffer:
 

 Q. During the course of the party, what did, did you get an understanding as to whether or not Van-darren McCray shot Byron Ross?
 

 A. It was after everybody was leaving, that’s when, I guess that’s when everybody was leaving, that’s when the argument was outside. I was still inside playing a video. He came in, that’s when he walked back in, he said you see what I’m talking about, he said, Byron still out there in front of him saying he didn’t shoot.
 

 Q. Okay. So, so Vandarren and Byron, there was an understanding that Vandarren did not shoot him; is that correct?
 

 A. Yeah.
 

 Q.
 
 And you got that from Byron Ross ?
 

 A. No, ma’am.
 
 I didn’t get him to say it.
 

 Q. But that was your understanding?
 

 A. Yes, ma’am.
 

 Q. Okay.
 

 [THE COURT]: You may explain that.
 

 [CHAPMON]: I mean, I couldn’t quite explain, but I just really want my answer, I mean, it was like, just like, it never seemed like Byron was the one with the problem. It wasn’t Byron. It was all of his brothers.
 
 Byron told me himself that he didn’t have no problem tuith him. It, he said it loas his brother.
 

 (Emphasis added). As shown from the proffer, Chapmon could not testify that Byron had stated that McCray was not his assailant, as Chapmon never heard Byron make such a remark. Rather, Chapmon’s proffered testimony was that Byron told him that Byron had no problem with McCray. This fact, as reflected in the following exchange during the direct examination of Chapmon, had already been testified to by Chapmon prior to the proffer:
 

 Q. Okay. And did Byron and Vandar-ren get along [at the alleged 2007 party]?
 

 
 *1050
 
 A. Yes, ma’am.
 

 Q. Did they talk?
 

 A. Yes, ma’am.
 

 Q. Did they joke?
 

 A. Yes, ma’am.
 

 Q. And they acted like [sic] best of Mends?
 

 A. Yes, ma’am.
 

 As can be seen from Chapmon’s testimony, he had already testified that he had seen Byron and McCray since the shooting and that the two had acted like the “best of friends” at that time. Any testimony that Byron had stated that he had no problem with McCray would have simply been cumulative of Chapmon’s direct-examination testimony. Furthermore, no reason has been proffered as to why such testimony would not have been inadmissible hearsay; clearly, Chapmon’s proffered testimony that Byron had said that he had no problem with McCray would not have qualified as a statement of identity.
 

 ¶ 16. Given the deference that is accorded to circuit courts in determining whether evidence should be admitted, we find no reversible error in the circuit court’s decision to exclude Chapmon’s hearsay testimony.
 

 2. Closing Argument
 

 ¶ 17. In his next contention of error, McCray claims that the circuit court erred when it did not sua sponte declare a mistrial during the State’s closing arguments. McCray contends that the prosecutor used several improper “send-a-message” arguments, thus rendering McCray’s trial unfair.
 

 ¶ 18. In
 
 Brown v. State,
 
 986 So.2d 270 (Miss.2008), the Mississippi Supreme Court explained whether a prosecutor’s use of a “send-a-message” argument constitutes reversible error: Depending upon the facts and circumstances of each case, “send-a-message” arguments may — standing alone — constitute reversible error.
 
 Payton v. State,
 
 785 So.2d 267, 271 (Miss.1999). In
 
 Payton,
 
 this Court found the following “send-a-message” statement to be reversible error:
 

 Send a message to these older, more mature, criminals, “We are not going to let you ruin young people’s lives like you have ruined these three people’s lives, and all these lives you endangered in the process.”
 

 Id.
 
 at 270.
 

 We recently addressed this issue in
 
 Spicer v. State,
 
 921 So.2d 292 (Miss.2006), in which we set forth two threshold inquiries, followed by a two-pronged test. The first threshold question is whether defense counsel objected.
 
 We noted that, despite the absence of objection, we will not procedurally bar the issue where “the [send-a-message] argument is so ‘inflammatory’ that the trial judge should have objected on his own motion.” Id.
 
 at 317 (internal citations omitted).
 

 Spicer’s
 
 second threshold inquiry is
 
 whether it appears, in examining the surrounding circumstances, that defense counsel invited the comment. Id.
 
 at 318. If so, of course, the issue may be waived.
 

 Once the two threshold questions are satisfied,
 
 Spicer
 
 provides that, for a finding of reversible error, “the court must determine (1) whether the remarks were improper, and (2) if so, whether the remarks prejudicially affected the accused’s rights.”
 
 Id.
 
 (internal citations omitted). In attempting to clarify the application of the test, we stated that
 

 it must be clear beyond a reasonable doubt, that absent the prosecutor’s comments, the jury could have found
 
 *1051
 
 the defendant guilty. This goes beyond a finding of sufficient evidence to sustain a conviction.
 

 Id.
 
 (internal citations omitted).
 

 In analyzing this language in
 
 Spicer,
 
 we find we should have employed the term “would” instead of “could.” Thus, to meet the second prong of the test, we hold that it must be clear beyond a reasonable doubt that, absent the prosecutor’s inappropriate comments, the jury would have found the defendant guilty. This, of course, amounts to a harmless-error analysis, and is the analysis to be used for the second prong of the
 
 Spicer
 
 test.
 

 Brorni,
 
 986 So.2d at 275-76 (¶¶ 12-16) (footnotes omitted) (emphasis added).
 

 ¶ 19. In the present case, no objection was made to any “send-a-message” remarks during the prosecutor’s closing argument. Furthermore, if the remarks were invited by defense counsel, then the issue was waived. We find that the remarks of which McCray complains were invited by defense counsel; consequently, this issue is waived. Even were this issue not waived, we find that the remarks are not so inflammatory as to have required sua sponte intervention by the trial court.
 

 ¶ 20. During her closing argument, McCray’s attorney stated the following:
 

 The only person that actually said Van-darren McCray and said he did it is Byron Ross, vice lord, the one who got shot. That’s it. No other witnesses.
 

 [[Image here]]
 

 And two of the Rosses didn’t see him shoot at or hit their brother. But they want somebody, they don’t care who, they want somebody to pay. They’re going, they’re going to mess him up. Because that’s what vice lords do. And he’s innocent.
 

 * * *
 

 I’m telling you the lack of witnesses is reasonable doubt. The lack of Walter Conner is reasonable doubt. If, and, and who are the gang members? Jonathan Chapmon? No, wasn’t even brought up because he’s not. Andrae Whitfield? No, wasn’t brought up because he’s not. These are Vandarren McCray’s friends. Terrance Booker? No, wasn’t even brought up. Kerry Burkes? No, wasn’t even brought up. These are good young men making their way in the community.
 

 Now, who would be jealous of them? Who would finger these men? Whose [sic] got something to gain? What is the motive here? He’s not a gangster. He’s just Vandarren McCray.
 

 * * *
 

 1:30 at night, dark, they had been at a club where they served alcohol, and yet nobody partakes. I don’t believe that. Why would you be at a club if you’re not going to participate? We all know nothing good generally happens after midnight.
 

 * * *
 

 I submit to you Vandarren McCray is innocent of this charge. There’s been a misidentification. He did not do it. If he had done it, they would have had witnesses here and they don’t. And he’s not a gang member. None of those young men we put on were gang members. Not even a breath, not even mention of it. And the others are knee deep in violence with the vice lords.
 

 It was only after this argument by defense counsel that the prosecutor responded with the complained-of remarks, which are as follows:
 

 
 *1052
 
 What this really comes down to, ladies and gentlemen, and what we started, what I struggled with in preparing this case is that there are two cases here. There’s one that you could have seen that said Byron and his family were at Mac’s Lounge, and Byron Ross got shot by Vandarren McCray. He says it’s Vandarren McCray. And then Vandar-ren McCray says, yeah, I did the shooting. My friends just say I did the shooting. That’s the simple story that we could have presented.
 

 But there’s a backdrop to that story that got drug in. Ladies and gentlemen, that backdrop is painted black and blue, the g.d. colors, and white and red, the vice lord colors. Ladies and gentlemen, I want to be clear with you. I want to make a point before I go forward that there’s no one sitting at my table with me. I represent the State of Mississippi, the Eleventh Circuit Court District, Coahoma County and Clarksdale. And this charge is alleged [sic] be against the laws of the State of Mississippi and against the peace and dignity of the State of Mississippi.
 

 So what I’m telling you when I tell you that is that Byron Ross is the alleged victim here. But that doesn’t mean that you can’t look over here and say, I don’t like what you were doing that night. I don’t like that vice lord stuff. I don’t like what they do. And you can look over here and say I don’t like what you were doing. I don’t like that gangster disciple stuff in my community.
 

 And you can say, I will not tolerate the violence on the streets. I will not tolerate the shooting because you don’t have to, ladies and gentlemen. I asked during voir dire, who’s aware of criminal street gangs that are out there and are part of the community. And there were so few hands that I was shocked.
 

 [OBJECTION]
 

 The answer during voir dire, as I said I was shocked so few people (unintelligible) didn’t want to talk about street gangs in Clarksdale or were afraid to talk about street gangs in Clarksdale. If that’s the case, if either two of those is the case, you either don’t know about them or just don’t want to talk about them, that means that you can’t stand up and say, I’m not going to tolerate them. And you absolutely do not check your good sense at the door. You look at the facts of this case, and your good common sense and your sound honest judgment, and you see a g.d., a gangster disciple on the street that shoots a young vice lord and what do you see? Ladies and gentlemen, that’s the backdrop. That’s the motive. That’s the intent, ladies and gentlemen. That’s the whole other picture. You don’t check your good sense at the door. Absolutely not.
 

 This case, in some sense, comes down to, do you believe Byron Ross or do you believe the defendant? And you’re the judges of the credibility. You make that judgment. You see who has been impeached, who has contradicted themselves and who hasn’t. But, beyond that, ladies and gentlemen, do not turn a blind eye to this backdrop that’s colored red and white and black and blue. You know what happened out there. You live in Clarksdale. You know what happened out there.
 

 The evidence has shown, the true colors have come through. Walter Conner, his true colors are black and blue. And the defendant, his true colors are black and blue. And yes, sir, and yes, ma’am, those are red and white colors on the other side. You betcha. Don’t look away from that. It’s part of this case.
 

 * * *
 

 
 *1053
 
 The evidence is before you, ladies and gentlemen, I’m going to leave it in your hands. But I -will argue to you, ladies and gentlemen, that you know what happened out there. You know what the evidence shows.
 

 As can be seen from the above, defense counsel suggested to the jury that her client and his witnesses were not involved in any gang violence, while the State’s witnesses were; the clear implication was that the jury should find McCray’s witnesses more credible as a result. The prosecutor was entitled to respond to defense counsel’s arguments as he did in this case. This issue has therefore been waived. Furthermore, we do not find that the remarks by the prosecutor were so inflammatory as to sua sponte require the intervention of the court. Finally, we find that the evidence is such that the jury would have come to the same result even if the prosecutor had not made the remarks in question.
 

 ¶ 21. This contention of error is without merit.
 

 3. Batson Challenges
 

 ¶ 22. In his third contention of error, McCray claims that the State committed gender discrimination when it used all of its peremptory strikes against African American females. There is no doubt from the record that the State used all of its peremptory strikes against females. When asked for neutral reasons for the strikes, the prosecutor provided reasons for several of the strikes. When pressed for reasons for the remainder of the strikes, he indicated that he was striking females in an attempt to get a more balanced jury as to gender.
 
 [1]
 

 ¶ 23. In
 
 Batson,
 
 the United States Supreme Court held that the State’s use of peremptory strikes is subject “to the commands of the Equal Protection Clause.”
 
 Batson,
 
 476 U.S. at 89, 106 S.Ct. 1712. Specifically, the
 
 Batson
 
 court held that “the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State’s case against a black defendant.”
 
 Id.
 
 In
 
 J.E.B. v. Alabama ex rel. T.B.,
 
 511 U.S. 127, 130-31, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the United States Supreme Court clarified that the holding of
 
 Batson
 
 extends to gender discrimination in jury selection.
 

 ¶ 24. We find, however, in this case that gender discrimination was not practiced by the State. The final makeup of the panel indicates that of the twelve jurors and four alternates, eleven were women. Clearly, the prosecutor allowed many women to serve on the jury, as almost seventy-five percent of the final panel makeup was female. Under these circumstances, we cannot find that the prosecutor violated
 
 Batson
 
 and its progeny in striking women after so many women had been accepted for the final panel.
 

 ¶ 25. This contention of error is without merit.
 

 A
 
 Cumulative Error
 

 ¶26. In his final contention of error, McCray contends that the cumulative errors committed denied him his right to a fair trial. Since we have found no error in the proceedings below, we find no cumulative error.
 
 Neal v. State,
 
 15 So.3d 388, 409 (¶ 55) (Miss.2009).
 

 
 *1054
 
 ¶ 27. THE JUDGMENT OF THE CIRCUIT COURT OF COAHOMA COUNTY OF CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF FIFTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH TEN YEARS TO SERVE AND FIVE YEARS OF POST-RELEASE SUPERVISION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO COAHOMA COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ, CONCUR. MAXWELL, J., NOT PARTICIPATING.
 

 [1]
 

 . There are several times during this portion of the record when whatever was said was unintelligible; therefore, there are several gaps in the transcript.