# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### October 5, 2010 Session

## STATE OF TENNESSEE v. KRISTOPHER SMITH

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-02796     John T. Fowlkes, Jr., Judge**

---

**No. W2010-00125-CCA-R3-CD  - Filed June 2, 2011**

---

Defendant-Appellant Kristopher Smith was convicted by a Shelby County jury of aggravated kidnapping and rape, both Class B felonies.  He was sentenced as a Range I, standard offender to an effective ten-year term of imprisonment in the Tennessee Department of Correction.  In this appeal, Smith claims the trial court erred by:  (1) failing to sustain his Batson challenge to the prosecution's peremptory strikes of two African American males; (2) finding that "the prosecution's explanation of its peremptory strike of a white male sufficiently sex neutral"; (3) finding that his prior aggravated robbery conviction was admissible for impeachment purposes; (4) denying his motion for judgment of acquittal and new trial; and (5) imposing an excessive sentence.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and J. C. MCLIN, JJ., joined.

Stephen K. Tapp, Memphis, Tennessee, for the Defendant-Appellant, Kristopher Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Theresa S. McCusker, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Trial.**  On October 23, 2007, the sixteen-year-old victim, J.V., was walking home from school and noticed a "beige" Cadillac pull up behind her.  She identified a photograph of the car, Exhibit 6, as the same car that approached her the day of the offense.  A man, whom she later identified as Smith, got out of the car and pointed a gun at her.  Smith told

her "to be quiet" and "to get in the car." The victim complied, got into the front seat of the car, and Smith drove her to "a dark place." The victim testified that Smith then forced her into the back seat of the car, had her to remove her pants and underwear, and placed his penis inside of her vagina. She explained that they had "regular" sex but could not recall if Smith ejaculated. The victim observed tattoos on Smith's body including a tiger on his right chest, the word "Boo" on his arm, and other words on the left side of Smith's chest. Before Smith pushed her out of the car, the victim grabbed a piece of paper from the car. When the victim found her way home, she told her mother about the attack and reported it to the police. The paper she grabbed from the car, Smith's electric bill receipt, was used by the police to locate Smith the next day. She did not know Smith prior to her attack in the instant case.

On cross-examination, defense counsel raised several inconsistencies in the victim's testimony in an attempt to impeach her. At trial, the victim testified that she was forced into the front seat of the car. However, at a prior hearing, the victim testified that she was in the backseat of Smith's car during the offense. The victim initially denied making this statement; however, when presented with the tape recording of her testimony from the earlier hearing, she stated that she could not remember everything about the offense. The victim further testified at trial that Smith had sex with her one time. However, when asked the same question by defense counsel at a prior hearing, the victim replied, "He did it, like, he just kept having sex with me." She continued, "more than once" and "[i]t's [sic] about four [times]." When pressed about the inconsistency of her statement, the victim exclaimed, "I know he had sex with me. I know that." She then maintained that Smith had sex with her one time, and explained:

> I don't know. I was just laying there. I'm going to put it like that. I was just laying there. He was doing whatever. I wasn't paying no attention to it or nothing.

Defense counsel continued to press the victim regarding her account of the offense; specifically questioning her location at the time she was pushed out of the car, the clothes that Smith wore, and whether she fought with Smith during the attack. In response, the victim stated:

> I really can't remember everything that happened that night[] because, I mean, that was like a year or two ago. I can't remember really things. Some things anyway. And I try not to remember anything that's bad.

She remembered enough, however, "to know that [Smith] was the same person [who raped her]."

Judy Pinson, a nurse-clinician at the Memphis Sexual Assault Resource Center (MSARC) and an expert in Forensic Nursing, examined the victim the morning after the day of the offense and testified regarding her report. Her examination of the victim revealed no injury and was "normal." She explained that her findings were common because "many victims of assault do not have injury" due to the nature of the estrogenized vaginal area. The nurse further examined the victim for the presence of sperm or DNA, neither of which was found. Finally, the nurse collected a rape kit which included specimens from the victim that were labeled and marked for evidence.

Officer Tyont Shavazz of the Memphis Police Department responded to the victim's call on the day of the offense. The victim provided him with a description of her assailant and a "receipt" she took from his car. He placed the receipt in a property and evidence bag and tagged it for evidence.

At the time of the offense, Detective Sam McMinn of the Memphis Police Department was assigned to the Criminal Apprehension Team (CAT). Detective McMinn was part of a team that was sent to locate a gold, four-door, 1998 Cadillac Deville with a tag number of 641 NQC. Following Smith's arrest by another unit, Detective McMinn secured the car, filled out a tow slip, and had the car towed to the Crime Scene Office. He was shown Exhibit 6 and confirmed that this was a photograph of the car towed in this case. He further identified Exhibit 13 as a photograph of the trunk lid and tag number belonging to the towed car.

Shelda Stafford, the branch supervisor of the Shelby County Clerk's Office, testified that her office replaces titles, tags, and registration for motor vehicles. As the keeper of records, Stafford confirmed that, on the date of the offense, tag number 641 NQC was registered to Kristopher J. Smith. Stafford brought an attested copy of the registration to court, which was offered into evidence as Exhibit 14.

Sergeant Ryan Thomas with the Sex Crimes Unit of the Memphis Police Department testified that he investigated the instant offense. He received a call at 11:30 p.m. on the date of the offense and met the victim at the hospital. The victim explained what happened and described her assailant as a six foot, five inch black male, wearing blue jeans, a black hooded sweater, and a black stocking cap. Sergeant Thomas retrieved the receipt taken from the car, which contained the name "Boenic Cage" and the address "3553 Hallbrook." Sergeant Thomas confirmed that he took photographs of Smith, which were entered as Exhibits 3 and 4. He further confirmed that the victim identified a jacket worn by her assailant as the same jacket worn by Smith when he was apprehended, which was offered into evidence as Exhibit 8. Prior to showing the victim a photo lineup, Sergeant Thomas provided an advice of rights

form to the victim explaining that the lineup might or might not include her assailant. The victim signed the advice of rights form and identified Smith from the lineup.

At the time of the offense, Officer Francis D. Carpenter was employed as a crime scene technician with the Memphis Police Department (MPD). He cut, collected, and sealed for evidence six independent fluid samples taken from the "back interior of the backseat" of the car recovered in the instant case. Officer Carpenter also processed the interior and exterior of the same car for fingerprints or "ridge detail" and found none. Officer Charles Cathey, another MPD crime scene investigator, photographed the vehicle while it was being processed and later transported the samples to the property room.

Hyun Kim, a criminologist with the Memphis Police Department assigned to the Sexual Assault Center, testified that he transported the fluid samples taken from the car in the instant case to and from the Tennessee Bureau of Investigation for the purpose of examination. While the evidence was under his custody and control, Kim testified that he did not open or alter the contents in any way.

Special Agent Forensic Scientist Donna Nelson testified as an expert in the area of forensic serology and DNA analysis. She examined perineal and vaginal swabs from the victim's underwear and found the absence of semen. Her examination of one of the six samples taken from the car, however, revealed the presence of blood. Upon further examination, Agent Nelson confirmed the presence of the victim's DNA. Although Agent Nelson confirmed only nine out of thirteen loci, a partial profile of the victim's DNA, this amount "still exceeded the current world population." Additionally, Agent Nelson had a saliva standard that had been taken from Smith, and he was excluded as a donor of the genetic material in the sample.

Following the close of the State's proof, defense counsel moved for a judgment of acquittal:

> I think the testimony of the victim has been sufficiently impeached by her. I think her testimony was – raises reasonable doubt within itself. And so just based on that, all of the other testimony of all the other witnesses, none of it has been particularly pointing to the defendant [except] maybe this last little testimony here about the DNA that was allegedly found in the back of the car.
>
> But, Your Honor, there's a question. This – the young lady lied about some very crucial matters like where she was dropped off. There's no reason for that unless there's something she is hiding.

-4-

Viewing the proof in the light most favorable to the State and reasoning that issues of credibility were for the jury to "grapple with" upon deliberation, the trial court denied Smith's motion.

Amber Clark, a Walgreens' employee, testified that on the day of the offense she observed Smith purchase cranberry juice from the photo counter at Walgreens. She identified a Walgreens' receipt, Exhibit 20, as confirmation that she "checked [Smith] out" at 8:27 p.m. on the night of the offense. On October 31, 2007, Clark identified a photo of Smith, Exhibit 22, as the person who purchased the cranberry juice on the night of the offense. On cross-examination, she acknowledged that the receipt did contain Smith's name. However, she recalled seeing Smith that night based on a conversation they had about cranberry juice.

Although Smith was originally charged with especially aggravated kidnapping and aggravated rape, the jury convicted Smith of the lesser included offenses of kidnapping and rape.

**Sentencing.** A sentencing hearing was held on December 10, 2009. Smith's status as a Range I, standard offender was not challenged. However, the State argued that he should receive a ten-year sentence based on his criminal history and use of a firearm during the commission of the offense. Defense counsel argued that the appropriate sentence was eight years, given the "scarcity of proof" in the case. The trial court enhanced Smith's sentence based on his undisputed criminal history, which included a prior robbery conviction, possession of intoxicating liquor, and assault. Although the court declined to apply the possession of a firearm enhancement, it imposed a sentence of ten years to be served at 100% in the Tennessee Department of Correction.

## ANALYSIS

**I. Peremptory Strikes Based on Race.** Smith invokes Batson v. Kentucky, 476 U.S. 79 (1986), and apparently challenges the prosecutions use of its peremptory strikes. However, his sole argument is that it was "error for the [trial court] not to 'follow up' with [an African American male juror] as he did with [a Caucasian female juror], even though his own *sua sponte* inquiry was not a challenge for cause from the State or the defendant." The State contends that the trial court properly found that Smith had failed to show that the State's use of peremptory challenges constituted racial discrimination violating the defendant's right to due process. We agree with the State.

The record shows that the State questioned the prospective jury about whether anyone had previously had a "bad experience with police" or had "[gotten] a ticket [that they] didn't

think [they] should [have] gotten[.]" One of the prospective jurors, Juror One,[1] responded affirmatively. The following exchange then occurred:

State:       Okay. And did you go to court?

Juror:       Yeah, I came to court.

State:       All right.

Juror:       And it was dismissed.

State:       Wow. All right. Did they – they say it was just no grounds for it or you got a good representation?

Juror:       Well, I don't know about that, but it got dismissed.

The State directed the same question to another juror, "And what about you, ma'am?" The other juror replied, "I didn't go to court, but I wasn't speeding neither [sic]." There was no follow-up question to this prospective juror, who was apparently a female. Later, during voir dire, the State asked another prospective juror, Juror Two, if he could convict the defendant of the charges in this case if the State met its burden beyond a reasonable doubt. The following discussion then occurred:

Juror:       I really couldn't say at the time. I would have to just see what we did and what.

State:       Okay. All right. Just saying that we prove this before you beyond a reasonable doubt, can you make that decision to convict the defendant?

Juror:       Beyond, I don't think so.

State:       You don't think that if you heard all of the proof and you were convinced of the defendant's guilt that you could convict him?

Juror:       I doubt it. It's just a simple fact that I'm hearing. I ain't seen anything.

---

[1]Traditionally, this court refrains from publishing juror names in our opinions. We therefore refer to the jurors in  this case as juror one and two.

State: Okay. All right. Well, can you keep an open mind as to the facts of the case and according to what decision you make, can you keep an open mind? Can you make the decision, you know to acquit or convict based on what you have heard?

Juror: Yeah.

Following the defense voir dire of the panel, the State exercised peremptory strikes for both Juror One and Juror Two. Defense counsel raised a Batson challenge because both jurors were African American males. The trial court then stated:

The first step is really I have to make out a prima facie case that the challenges are based on some prohibited area such as race. I was getting really ready to call another name that they had challenged which is [Juror Three] who was a male white. They did exercise challenges on a black man before and then also [Juror One]² this time. So I'm not sure that a prima facie case has been made out at this time. But I will turn to the State and ask them for a race neutral reasons why the three challenges that they've exercised were exercised[.]

In regard to prospective Juror Two, the State explained that he was excused because he replied, "[N]o," when asked if he would convict upon proof of the defendant's guilt beyond a reasonable doubt. In regard to Juror One, the State explained that he was excused because it appeared he "had an issue with law enforcement and he wouldn't divulge what it was." In regard to the Caucasian male prospective juror, the State explained that he was excused because "he looked at [the prosecutor] with skepticism the entire time" and was "uninterested."

In denying the Batson challenge, the trial court stated:

If there [had] been a challenge for cause [to Juror Two], I would have followed up with him. But if he'd maintained the answers that he gave the prosecutor, I would have granted a challenge for cause in light of the answers he gave. And then [Juror One]. I remember the answers that he gave about police officers and the ticket, and based upon the answers that were given and the exchange, there are reasons other than race to base those challenges on. And so for those reasons, I don't think a prima facie case was made but[,] even if it had been made, there are race neutral reason[s] for the challenges[.]

---

²The trial court referred to this juror by last name only. It is unclear which of the two challenged jurors it is referring to here because they both share the same last name.

It is well established that a state's use of peremptory challenges to intentionally exclude jurors based on race violates the defendant's right to equal protection. Batson v. Kentucky, 476 U.S. 79 (1986). In order to establish such a violation, a defendant must first make a prima facie showing of purposeful discrimination against a prospective juror. Batson, 476 U.S. at 93-94. In doing so, the defendant must establish "that a consideration of all the relevant circumstances raises an inference of purposeful discrimination." Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 903 (Tenn. 1996). If a prima facie showing of purposeful discrimination is established, the burden then shifts to the state to establish a neutral basis for the challenge. Batson, 476 U.S. at 97.

The trial court must give specific reasons for each of its factual findings in ruling on peremptory challenges. Woodson, 916 S.W.2d at 906; see also State v. Robinson, 146 S.W.3d 469, 505-06 (Tenn. 2004). This should include the reason the objecting party has or has not established a prima facie showing of purposeful discrimination. The trial court's findings are to be accorded great weight and will not be set aside unless they are clearly erroneous. Id.; see also Miller-El v. Cockrell, 537 U.S. 322, 339-40 (2003) (noting that deference should be given to the trial court's ruling since the trial court is in the best position to make credibility determinations regarding a prosecutor's race-neutral explanation).

As an initial matter, we decline Smith's invitation for us to take judicial notice of a magazine article attached to the appendix of his brief. James DuBose v. Tony Parker, Warden, No. W2005-01320-CCA-R3-HC, 2005 WL 3384723, at *4 (Tenn. Crim. App., at Jackson, Dec. 9, 2005) (noting that "documents attached to appellate briefs but not certified into the record cannot be considered as part of the record on appeal"), perm. to appeal denied (Tenn. Aug. 21, 2006); see also Tenn. R. App. P. 28(a). Smith further urges this court to view the prosecution's lack of follow-up questions to female jurors regarding the same line of questions posed to the African American male jurors as evidence that the prosecutor's explanation for peremptorily striking the two African American jurors was pre-textual. We disagree.

First, Smith has failed to overcome the threshold burden of establishing a prima facie showing of racial discrimination. In fact, the record shows that when defense counsel lodged his Batson challenge, the trial court shifted the burden to the State to establish a neutral basis for the challenge without the requisite showing from the defense. Also, we note that defense counsel failed to make an objection on pretext grounds regarding the prosecution's failure to ask follow-up questions to female jurors. See Tenn. R. App. P. 36(a) (Relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."). He further fails to cite any authority which permits this court to override the trial court's determination of the prosecution's credibility when it submitted race-neutral reasons

for exercising its strikes. We have nevertheless compared the prosecutions exchanges with the two female jurors and conclude that the trial court properly determined the reasons given by the State for exercising both peremptory strikes were race neutral. Smith's claim regarding the prosecution's failure to challenge one of the female jurors regarding her impartiality is simply not supported by the record. Even if the prosecution wanted to exercise such a challenge, this same juror was excused for cause by the defense during a bench hearing before the prosecution was given an opportunity to do so. Finding no clear error, Smith is not entitled to relief on this issue.

**II. Gender-Based Peremptory Strike.** In an extension of the argument in Section I of this opinion, Smith argues that the prosecution's explanation for excusing a single white male juror was "pre-textual" and "further evidence of the prosecution's desire for a preponderance of females on this rape jury[.]" The State maintains that the trial court properly allowed the peremptory strike of a white male from the jury.

We acknowledge that the Tennessee Supreme Court has applied the same standards used in race-based discrimination to cases of gender-based discrimination. See State v. Hugueley, 185 S.W.3d 356, 376-77 (Tenn. 2006) (citing J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 129 (1994)). Applying those same principles, we conclude that the record supports the trial court's determination that the State's exercise of a peremptory strike of a single white male was gender-neutral. Finding no clear error, Smith is not entitled to relief.

**III. Admissibility of Prior Aggravated Robbery Conviction.** Smith apparently argues that the trial court's discussion of his prior robbery conviction during the Momon hearing amounted to a pre-trial ruling on the admissibility of the conviction. The State contends that the trial court's discussion of the likely consequences of Smith testifying was proper. We agree with the State.

The record shows that a Momon hearing was held to determine whether Smith intended to testify at the trial. During defense counsel's questioning, Smith acknowledged that if he chose to testify, his prior robbery conviction might be used to impeach his testimony. He further agreed that he freely and voluntarily decided not to provide testimony during the trial. The trial court then questioned Smith further, and stated, in pertinent part:

Court:      Okay. Your lawyer mentioned a conviction for robbery. We
            would have a hearing about your background, your criminal
            convictions, and I would decide whether or not the State would
            be allowed to impeach you or ask you about those convictions.
            You understand that?

Smith:       Yes.

Court:       Now, robbery is the type of a conviction, it goes to honesty,
             dishonesty. And without hearing more, I would allow the State
             to ask you about that conviction. We'd go into more detail if we
             were to have a hearing. But you understand that, don't you?

Smith:       Yes.

We view nothing improper about the above exchange. Furthermore, the record shows that Smith had decided not to testify prior to the trial court discussing the potential implications of his prior conviction. The trial court clearly advised Smith that an additional hearing would be held regarding his prior conviction. Smith is not entitled to relief on this issue.

**IV. Denial of Motion for Judgment of Acquittal and Motion for New Trial.** Smith claims there was insufficient evidence to support his convictions of aggravated kidnapping and rape based on the inconsistencies in the victim's testimony. The State maintains that there was sufficient evidence for a reasonable jury to find the defendant guilty of both offenses.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997).

Smith was convicted of rape and aggravated kidnapping. Rape is the unlawful penetration of the victim accomplished by force or coercion. T.C.A. § 39-13-503(a)(1). Aggravated kidnapping is "false imprisonment, as defined in § 39-13-302" that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Id. § 39-13-305(a)(1).

Our review of the record shows that there was more than sufficient proof for a rational juror to have found that Smith unlawfully penetrated the victim by force or coercion. There was also sufficient proof showing that Smith falsely imprisoned the victim while in possession of a deadly weapon. The victim testified that Smith grabbed her from the sidewalk and forced her into his car while armed with a gun. She further testified that she could not get out of his car and he drove her to a "dark area". He then forced her to remove her clothing and penetrated her vagina with his penis. She was able to identify Smith by certain tattoos, which included the word "Boo" displayed on the left side of his chest. She also grabbed a receipt from his car which was used by law enforcement to locate Smith. Finally, she identified the car in which the attack occurred and a partial profile[3] of her DNA was recovered from the same car. Smith's argument is no more than an attack on the victim's credibility. Issues concerning a witness's credibility are for the jury, and not for this court to determine. See Henley, 960 S.W.2d at 578-79. Accordingly, Smith is not entitled to relief.

**V. Excessive Sentence.** Smith argues that the trial court erred in imposing a sentence two years above the minimum in the range for a Range I, standard offender. He contends he should have received a sentence of eight years. The State contends the trial court properly imposed a ten-year sentence after applying one enhancement factor based on Smith's prior criminal history.

Under the new sentencing law, the trial court's discretion in sentencing was broadened and the applicable enhancement and mitigating factors were merely advisory, not mandatory. See State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2008). The Compiler's Notes to the amended Tennessee Code Annotated section 40–35–210 (2006) state that the amended act "shall apply to sentencing for criminal offenses committed on or after June 7, 2005." Smith committed the offenses in this case on October 23, 2007; therefore, he was sentenced under the 2005 amendments to the sentencing act. Consequently, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent

___

[3] Smith attaches another article regarding partial profiles for our consideration on appeal. As previously noted, this is improper and we decline his invitation to take judicial notice of facts not accepted into evidence before the trial court.

with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 344 (citing T.C.A. § 40–35–210(d)).

Rape and aggravated kidnapping are Class B felonies; thus, the range of punishment for a Range I, standard offender is eight to twelve years. T.C.A. § 39–13–504(b) (2006); T.C.A. § 40–35–112(a)(2) (2006). At the sentencing hearing, the trial court determined that one enhancement factor was satisfied under Tennessee Code Annotated section 40-35-114. Consequently, the trial court sentenced Smith to ten years, the middle of the range. The trial court found that enhancement factor (1) was met based on Smith's extensive criminal record. The pre-sentence report, which was admitted as an Exhibit, shows that Smith has a criminal history consisting of one prior felony conviction for aggravated robbery, misdemeanor possession of marijuana, misdemeanor possession of intoxicating liquors, and misdemeanor assault. The trial court did not state whether any mitigating factors were applicable.

The record shows that the trial court considered the applicable sentencing principles, as well as the relevant facts and circumstances; therefore, our review of sentencing is de novo with a presumption that the trial court's determinations are correct. See id. § 40-35-401(d) (2005); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Smith has the burden of proving that the sentence was improper. T.C.A. § 40-35-401(d) (2006), Sentencing Commission Comments. This means that if the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, this court may not disturb the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Here, Smith does not contest that enhancement factor (1) is applicable. He also does not claim that any mitigating factors are present. Smith's sole argument is that "the practice of using misdemeanor convictions to enhance due to criminal history indeed may not be consonant with Tenn. Code Ann. § 40-35-210(f)[.]" This argument is unpersuasive. The record supports the trial court's determination that enhancement factor (1) is applicable, and no mitigating factors are evident from the record. Thus, the trial court acted within its discretion under section 40-35-210(c)(2) by imposing a ten-year sentence. The sentence is also consistent with the sentencing principles and considerations of the Criminal Sentencing Reform Act of 1989. See T.C.A. § 40-35-210(d). Accordingly, Smith's sentence of ten years will not be disturbed.

We reiterate that under the amended sentencing act, the trial court has broad discretion in sentencing a defendant:

[Under the amended sentencing act] a trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

Carter, 254 S.W.3d at 345–46.

Upon review, we conclude the trial court did not err in sentencing Smith. This court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Carter, 254 S.W.3d at 346. Accordingly, Smith is not entitled to relief on this issue.

**Conclusion.** Based on the foregoing, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE